<u>FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| KAREN L. SUTER, the Commissioner of Banking and Insurance of the State of New Jersey, in her capacity as Liquidator of Integrity Insurance Company,<br><br>          Plaintiff,<br><br>v.<br><br>GENERAL ACCIDENT INSURANCE COMPANY OF AMERICA,<br><br><br>Defendant. | Civ. No. 01-2686 (WGB)<br><br>**<u>MEMORANDUM<br>OPINION</u>** |

**<u>APPEARANCES</u>:**
SILLS CUMMIS RADIN TISCHMAN EPSTEIN & GROSS, P.A.
BY:  Thomas S. Novak, Esq.
     Rebecca Moll Freed
One Riverfront Plaza
Newark, New Jersey 07102-5400

     Counsel for Plaintiff

BUDD LARNER ROSENBAUM GREENBERG & SADE, P.C.
BY:  Vincent J. Proto, Esq.
     Joseph J. Schiavone, Esq.
150 John F. Kennedy Parkway
Short Hills, New Jersey 07078-0999

     Counsel for Defendant


**Bassler, Senior District Judge:**

     Plaintiff files this post-trial motion to exclude testimony

of Defendant's expert, Dr. Jacob Haft, and Defendant files a

similar motion to exclude testimony of Plaintiff's experts, Dr.

-1-

Ian C. Gilchrist and Mr. John J. Bado[1].  For the reasons set forth below, Defendant's motion is DENIED with respect to Dr. Gilchrist and DENIED in part and GRANTED in part with respect to Mr. Bado.  Plaintiff's motion is DENIED.

**I. Background**

As the facts of the matter before the Court are highly complex, and as they are laid out in their entirety in this Court's Opinion denying the parties' cross motions for summary judgment, a complete recitation is unnecessary at this time.  See Suter v. General Accident Ins. Co. of America, No. 01-2686 (D.N.J. Sept. 30, 2004).  For the purposes of this Opinion, a brief summary of the relevant facts and the parties' claims will suffice.

In 1979, the pharmaceutical company Pfizer acquired a medical manufacturer called Shiley.  In that same year, the Food and Drug Administration ("FDA") approved a mechanical heart valve developed by Shiley.  The valve was designed to replace a patient's own heart valve, in cases where the natural valve was diseased or deformed.  The Shiley valve was sold on the American market until 1986, and was implanted in approximately 86,000

---

[1]Both parties submitted motions *in limine* to preclude certain testimony of the three experts.  The Court reserved judgment on the motions until the completion of the bench trial, and the parties now move to exclude portions of the expert trial testimony.

patients worldwide, including around 40,000 in the United States. Id. at 4.

Unfortunately for Shiley and Pfizer, and most unfortunately for many valve recipients, pieces of the valve (the "struts" that held in place the disc that opened and closed to regulate blood flow) would occasionally fracture.  Fracture of both "legs"[2] holding the strut in place would lead to catastrophic injury, and in some cases, death.  Id. at 5, 10.  Thousands of Shiley valve recipients brought claims against Pfizer.  The claims generally fell into one of three categories: fracture claims, based on valves that had actually failed, resulting in severe injury or death; anxiety claims, brought by recipients whose valves were still functioning, but who had suffered anxiety upon learning of the alleged defects; and re-operation claims, which were brought by the recipients who qualified (under predetermined medical criteria) to undergo a valve-removal operation.  Id. at 10-11. Pfizer's liability resulting from the valve-related claims was in the range of hundreds of millions of dollars.  Id. at 12.

The plaintiff appearing before the Court in this action is the Liquidator of the Integrity Insurance estate ("Integrity" or "Estate").  Prior to its insolvency, Integrity had insured

---

[2]"Complete" or "total" strut failure/fracture refers to a situation where both "legs" holding the strut in place have fractured.  In the case of "partial" strut failure/fracture, only one of the legs has sustained fracture.  See Pl. Ex. 3, at 4.

Pfizer; Defendant General Accident had been Integrity's reinsurer.  A reinsurance contract enables the reinsured (the original insuring entity) to transfer some part of its risk to another entity, the reinsurer.  See id. at 3 (citing to N. River Ins. Co. v. Ace American Reinsurance Co., 361 F.3d 134, 137 (2d. Cir. 2004)).  Plaintiff alleges that General Accident has failed to pay reinsurance due to Integrity, and General Accident contends that reinsurance payments are not due, as Integrity failed to determine in good faith whether the valve-related claims actually triggered coverage obligations under the reinsurance policy.

Whether Pfizer's claims were covered under its policies with Integrity (and thus should be reinsured by General Accident) turns in large part on the date in which the injury is determined to have occurred.  The Integrity policies were "excess" policies, which were designed to cover only those liabilities that ran in excess of Pfizer's policies with its primary insurer, Transit Casualty Company ("Transit").  Suter, No. 01-2686, at 7.  Under the Transit policies, and thus under the Integrity excess "follow form" policies, no coverage was triggered unless the injury or damage took place during the coverage period.[3]  Id.  Thus, the

_____

[3] The Integrity policies at issue in this case are occurrence-based.  Under this type of policy, coverage is determined by when the alleged injury took place, as opposed to a claims-based policy, which determines coverage according to the date that the claim is brought.  In re Silicone, 667 N.W.2d 405,

-4-

relevant question is, at what point can injury to the valve recipients be said to have occurred?

Plaintiff contends that bodily injury took place at the time the valve was implanted.  Defendant, on the other hand, argues that there is no bodily injury until the struts actually fracture, and that Plaintiff's conclusion to the contrary was not made reasonably and in good faith.  Defendant thus claims it is under no obligation to indemnify Integrity.  Not surprisingly, each side has an expert whose testimony supports its conclusion. These post-trial motions, then, represent each side's effort to exclude certain testimony of the other party's experts.

Because the primary thrust of each side's motion is to bar testimony tending to show that injury occurred or did not occur at a given moment in time, before the Court reaches a discussion of the motions, it first addresses Plaintiff's contention that the In re Silicone Implant Insurance Coverage Litigation opinion, 667 N.W.2d 405 (Minn. 2003), compels the conclusion that injury must be assumed as of the date of implant. Plaintiff's Brief in Opposition to Defendant's Motion to Preclude (hereinafter Pl. Opp. Br.) at 8.  If the Court finds this opinion as persuasive as Plaintiff does, the question of whether to admit the related expert testimony becomes moot.

---

409.

## II. The In re Silicone Litigation

In In re Silicone, the Supreme Court of Minnesota sought to
clarify the coverage obligations of several high-level excess
insurance carriers with regard to the insured, 3M, the
manufacturer of silicone gel breast implants that had been the
subject of ongoing mass tort litigation.  Id. at 409.  While 3M
had defended against the mass tort claims on the grounds that
claimants were unable to prove a causal connection between the
alleged injury (symptoms characteristic of systemic autoimmune
disease) and the implants, 3M nonetheless settled the class
action suit.  Id. at 410.  The insurers then brought a
declaratory judgment action, in which they sought to determine,
inter alia, the date at which coverage was triggered by the
occurrence of actual injury, i.e., whether injury occurred during
the coverage period.  Id. at 411.

At a bench trial, the district court concluded that,
although there was no medically or scientifically accepted causal
relationship between the implants and the alleged injury, it was
willing to assume for the purposes of the insurance litigation
that an injury in fact occurred.  Id. at 413.  It furthermore
found that, although many plaintiffs did not begin to experience
symptoms until after the expiration of insurance coverage, the
injury actually occurred at the time of implant, as "[l]eaked
silicone is in contact with body tissues from the time of implant

-6-

until the formation of a protective capsule, a period of several weeks." Id. at 414. Since the silicone comes into contact with cells during that period, the district court found that it was "more likely than not ... the period at which cellular abnormality is produced. ... Such cellular damage is determinable, constitutes the underlying bodily harm without which there would be no manifestation in the form of disease symptoms, and satisfies the 'actual injury' legal standard for trigger." Id.

The insurers argued that these alleged cellular injuries were fictional, and thus unable to trigger coverage under the policies. Id. at 416. The Supreme Court of Minnesota affirmed the district court's conclusion, however, stating that, since the underlying settlement was premised on the notion that the implants caused the injuries, it was fair for the district court to assume that injuries had, in fact, occurred, even in the absence of medical evidence proving causation. Id. Since the finding that cellular injuries occurred was based on the assumption that *some* injury had occurred, the insurers were essentially estopped from arguing that the cellular injuries were fictional. Id. And, "as the insurers concede, they cannot at this post-settlement stage of the proceedings deny coverage for the losses 3M incurred in its settlement on the theory that the silicone did not injure the plaintiffs." Id.

As the settlement underlying the present action (Bowling v. Pfizer Corp., see Pl. Opp. Br. at 5) was premised in part on the notion that the valves caused injury prior to the moment of fracture (the "anxiety" claims, as discussed supra Part I), Plaintiff argues that In re Silicone compels the Court to presume injury prior to fracture in this case as well.  Pl. Opp. Br. at 9; see also Plaintiff's Brief in Support of Its Motion to Preclude (hereinafter Pl. Br.) at 17 ("Because a settlement has already been reached on this underlying issue [Defense expert] Dr. Haft cannot, at this post-settlement stage of the proceedings, opine that patients who have been implanted with defective ... valves are not injured until after they suffer catastrophic valve failure.  Rather, as set forth in the In re Silicone case, injury must be assumed...").

Leaving aside the fact that the Minnesota state court's decision does not bind this Court, Plaintiff's contention is untenable on the grounds that it ignores the distinction between In re Silicone and the present case.  The settlement in In re Silicone was premised on there having been an injury upon implant - the leaking of silicone into the recipient's body, and its reaction with cells, which would lead to further complications. 667 N.W.2d at 416.  In the Bowling settlement, the "anxiety" claims were premised not on the notion that a bodily injury had occurred at implant, but rather that an emotional injury had

-8-

occurred: valve recipients were forced to live in fear that their valves were suddenly and without warning going to fracture.  Pl. Opp. Br. at 6.  Since no bodily injury was presumed by the settlement, no bodily injury need be assumed here, and expert testimony assisting the Court in its determination of the time of injury is relevant.  The Court therefore proceeds to the questions raised by the parties' renewed motions to exclude.


## III. Defendant's Motion

### A.  The Testimony of Dr. Gilchrist

Plaintiff's expert, Dr. Ian C. Gilchrist, has had experience with the Shiley valve since graduating medical school in 1982. Tr. May 25, 2005, at 14-15.  In addition to pre- and post-operative care of recipients, Dr. Gilchrist's valve-related experience includes research, diagnostic and X-ray screening, and consulting recipients whose valves are defective or potentially defective.  Pl. Opp. Br. at 12.  He has specialized in the examination of valve recipients for strut fracture for over twelve (12) years.  Tr. May 25, 2005, at 8.   Nevertheless, Defendant claims that Dr. Gilchrist is not properly qualified to testify as to whether bodily injury may be said to occur at the time of implant.  This claim is based on the portion of Dr. Gilchrist's belief that valve recipients are injured as of the date of implant, since they have not received that which they

bargained for, i.e. a working valve.  Id. at 125-26.  Defendant refers to this theory as the "benefit of the bargain" theory of injury, and contends that it is unsupported by reliable medical principles, that it represents nothing more than a "layperson's view of law and economics," and that it is therefore inadmissible under Rule 702 of Federal Rules of Evidence.  Defendant's Brief in Support of Motion to Preclude (hereinafter Def. Br.) at 13.

Defendant further moves to strike any reference to the Shiley Valve as a "ticking time bomb," a characterization that Dr. Gilchrist makes in his report.  Pl. Ex. 3, at 2.  Defendant's view is that this metaphor is based solely on anecdote, and not on medical/scientific knowledge, and it is therefore inadmissible as unreliable under Rule 702 and unduly prejudicial under Rule 403 of the Federal Rules of Evidence.  Def. Br. at 3, 15.

### 1. Benefit of the Bargain

The admissibility of certain expert testimony is primarily governed by Rule 702 of the Federal Rules of Evidence and the United States Supreme Court decision in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In the Daubert decision, the Supreme Court vested district court judges with the obligation to act as "gatekeepers" by screening proposed scientific expert testimony to ensure its relevance and reliability under Rule 702.  509 U.S. 579, 589.  The Daubert requirement was extended beyond scientific testimony to implicate the  Rule 702 "technical and other specialized knowledge" in Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999).

The Third Circuit has further defined the contours of Rule 702, explaining that expert testimony must satisfy a three-part test for admissibility: qualification, reliability, and fit.  In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741-44 (3d Cir. 1994); see also Calhoun v. Yamaha Motor Corp. U.S.A., 350 F.3d 316, 321 (3d Cir. 2003).  The qualification part requires that the expert "possess certain specialized expertise." Id. (quoting Schneider v. Fried, 320 F.3d 396, 405 (3d Cir. 2003)).  The Third Circuit has "interpreted this requirement liberally," and has held that a "broad range of knowledge, skills, and training qualify an expert as such."  Calhoun, 350 F.3d at 321 (quoting In re Paoli, 35 F.3d at 741).

Under the reliability requirement, the expert's opinion must be grounded in scientific procedures and methods, as opposed to "subjective belief or unsupported speculation."  In re Paoli, 35 F.3d at 742 (quoting Daubert, 509 U.S. at 590).

"Fit" requires the expert testimony to be relevant to the issues in dispute.  Because Rule 702 demands that the expert testimony assist the trier of fact, such testimony will be

admissible only if the research is sufficiently connected to the facts and issues presented in a given case.   In re Paoli, 35 F.3d at 743.   The results of research or a scientific study may be valid for the purpose of explaining one issue, but not another. See Daubert, 509 U.S. at 591 (comparing testimony as to the fullness of the moon for the purpose of assisting the trier of fact in determining whether the night was dark (sufficient fit), with the same testimony for the purpose of demonstrating to the trier of fact that the defendant behaved irrationally (insufficient fit)).

Defendant contends that Dr. Gilchrist's testimony does not meet these standards.   Specifically, Defendant argues that the opinion that valve recipients are injured at implant because they do not receive the valve they bargained for is not supported by "any generally accepted principle of cardiac medicine."   Def. Br. at 11.   Defendant also argues that there is no evidence that the "medical community as a whole presumes that recipients of Shiley valves have suffered bodily injury at the time of implantation." Id.

The Court notes, first, that approval by the medical community is but one factor to weigh in the determination of reliability, and it is not dispositive.   "'General acceptance' is not a necessary precondition to the admissibility of scientific evidence under the Federal Rules of Evidence, but the Rules of Evidence -- especially Rule 702 -- do assign to the trial judge the task of ensuring that an expert's testimony both rests on a

-12-

reliable foundation and is relevant to the task at hand."
Daubert, 509 U.S. at 597.  Furthermore, where an expert opinion
is based primarily on experience, the testimony may be admitted,
as long as the expert can explain "how that experience leads to
the conclusion reached, why that experience is a sufficient basis
for the opinion, and how that experience is reliably applied to
the facts."  Rule 702, Advisory Committee Notes (2000
Amendments).  Dr. Gilchrist's testimony should therefore be
admitted if the Court determines that his professional experience
provides a reasonable basis for his opinion, and that his
experience is applicable to the facts at hand.

Defendant claims to take issue with Dr. Gilchrist's use of
the "benefit of the bargain" theory, but the real opposition
appears to the Court to be to the substance of the testimony.
Put simply, Dr. Gilchrist believes that Shiley Valve recipients
were injured immediately upon implant.  Defendant wants to show
that patients were not injured during the insurance coverage
period. The doctor's opinion and the Defendant's position are
thus inherently conflicted.  However, Dr. Gilchrist's report
shows that his opinion is based upon more than what the Defense
refers to as a "layperson's view of law and economics"; rather,
the conclusion is based on his many years of professional
experience treating valve recipients and researching the valve
itself.

Dr. Gilchrist has worked with valve recipients since 1982

-13-

and has been involved in "scientific research" of the Shiley
valve for more than ten years.  Tr. May 25, 2005, at 14-15.  A
large portion of this research has been focused on identifying
those valves that have already sustained partial strut fracture,
in an effort to remove partially fractured valves from the
recipients who were at greatest risk of suffering catastrophic
injury.  Id. at 8.  Because the fractures are so small, they are
barely visible with the x-ray technology generally available, and
even the specialized equipment Dr. Gilchrist currently uses fails
to identify approximately 70% of the fractures.  Pl. Ex. 3, at
10.  This difficulty in ascertaining when the valves are actually
fractured leads to the reasonable conclusion that every patient
is at risk of suffering catastrophic injury.  Dr. Gilchrist
presumes every recipient to be injured at the time of implant,
since he believes any one of their valves could fracture at any
given moment.

It is Dr. Gilchrist's opinion that the valves are "defective
from the date of manufacturing," and once implanted inside a
patient's heart, would "continually deteriorate over an
unpredictable time course." Pl. Ex. 3, at 4.  It is this
structural defect, combined with his belief in the valves'
continued deterioration that forms the basis for Dr. Gilchrist's
opinion that recipients are injured at the time of implant.  Dr.
Gilchrist simply uses the "benefit of the bargain" language to

-14-

clarify the point that patients who received non-defective valves
would not be injured, while patients who receive inherently
defective valves are injured.  The Court is not convinced that
the doctor is claiming the injury valve recipients actually
suffer is the loss of the benefit of their bargain.  Moreover,
the Court is satisfied that Dr. Gilchrist's experience reasonably
supports his opinion and reliably applies to the facts of this
case.  This part of the Defendant's motion is therefore denied,
and the testimony will be included.


###    2. The Ticking Time Bomb

Defendant further moves to exclude the part of Dr.
Gilchrist's report in which he refers to the Shiley Valve as a
"ticking time bomb."  Defendant contends that this
characterization is both unreliable under Rule 702 and highly
prejudicial under Rule 403.

The Defendant's Rule 702 argument is that Dr. Gilchrist's
characterization of the valve as a "ticking time bomb" is based
purely on anecdotal evidence, and not on "reliable principles of
cardiac medicine." Def. Br. at 15.  The Court is not moved by
this contention.

Defendant cites to an unpublished New York case, Playtex
Prods., Inc. v. Procter & Gamble Co., Civ. No. 02-8046, 2003 WL
21242769 (S.D.N.Y. May 28, 2003) to support the proposition that

such anecdotal evidence is inadmissible.  In that deceptive advertising and unfair competition case, Procter & Gamble moved to exclude Playtex's expert doctor's opinion that "'the vast majority of women will not feel a well-designed tampon' upon proper insertion." Id. at *10.  The Southern District granted the motion to exclude because the opinion was based solely on "anecdotal conversations" with patients, and the doctor had "not seen or based her opinion on any data" actually supporting the claim. Id.  The court found that, because the claim could not be tested or verified, it was unreliable and inadmissible.  Id.

Defendant General Accident equates Dr. Gilchrist's "time bomb" metaphor with the Playtex claim, arguing that the "evidence" offered "in support of this metaphor is wholly anecdotal and based largely on his and his patients' personal views." Def. Br. at 15.  The Court is by no means convinced that the use of a metaphor requires a medical basis, but even if that were the case, Dr. Gilchrist's use of the phrase seems consistent with his experience with the valve.  He states that the Shiley valves "are known for their audible ticking sound." Pl. Ex. 3, at 2.  He believes the valves are inherently defective, and he has made a career out of screening recipients to ascertain the valves–and patients–at the highest risk for catastrophic injury. Id. at 9.  He believes that the true or accurate failure rate of the Shiley valve is unknown, and that where there is such

failure, the mortality rate is high (60%).[4]  Id. at 4.  His
opinion thus appears to be that any implanted valve carries a
risk of fracture, and any recipient carries a risk of
catastrophic injury.

Webster's Dictionary defines "time bomb" as: (1) "a bomb so
made as to explode at a predetermined time," and (2) "something
with a potentially dangerous or detrimental delayed reaction."
WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 1235 (9th ed. 1990).  Dr.
Gilchrist's opinion that "ticking time bomb" is a metaphor for
the Shiley valve is reasonable in light of this definition: the
valves generally do not fracture immediately upon implant, but
rather at some later time.  The valve is the "something," and the
fracture is the "potentially dangerous or detrimental delayed
reaction."  Dr. Gilchrist's use of this phrase to describe the
valve reflects a common understanding of a commonly used
metaphor, and his belief in the accuracy of this descriptive
phrase is adequately supported by his research and work with
valve recipients.  The Court concludes that the metaphor is

_____

[4]Dr. Gilchrist bases his opinion that the actual valve
failure rate is unknown on the following three factors:
    1. Only 50% of valve recipients registered with Shiley
    2. Not all patients implanted with Shiley valves knew that
they were Shiley valves.  The families of patients who died may
not have known that the valve could have caused the death.
    3. Even the families of those patients that were aware of
valve failure as a possibility may not have known that a
defective valve led to a patient's death.  They may have easily
attributed the death to another disease or condition.  Pl. Ex. 3,
at 8. See also Tr. May 25, 2005, at 75-77.

admissible under Rule 702 and continues on to the Defendant's
Rule 403 claim.

Rule 403 of the Federal Rules of Evidence provides:

Although relevant, evidence may be excluded if its
probative value is substantially outweighed by the
danger of unfair prejudice, confusion of the issues, or
misleading the jury, or by considerations of undue
delay, waste of time, or needless presentation of
cumulative evidence.

However, evidence should be excluded under Rule 403 "only
sparingly since the evidence excluded is concededly probative.
The balance of the rule should be struck in favor of
admissibility." Blancha v. Raymark Industries, 972 F.2d 507, 516
(3d Cir. 1992) (internal citations omitted). Courts have also
"recognized that in the context of a bench trial, evidence should
not be excluded under Rule 403 on the grounds that it is unfairly
prejudicial, because the Court is capable of assessing the
probative value of the article and excluding any arguably
improper inferences." Tracinda Corp. v. DaimlerChrysler AG, 362
F. Supp. 2d 487, 497 (D.C. De. 2005); see also Gulf States Utils.
Co. v. Ecodyne Corp., 635 F.2d 517, 519 (5th Cir. 1981) (stating
that Rule 403 assumes that a trial judge can "discern and weigh
the improper inferences that a jury might draw from certain
evidence, and then balance those improprieties against probative
value and necessity. Certainly, in a bench trial, the same judge
can also exclude those improper inferences from his mind in
reaching a decision.").

Defendant argues that "the sole purpose of the 'time bomb' metaphor is to inflame and to cause confusion on the primary issue of whether bodily injury takes place upon valve implantation." Def. Br. at 15.  The Court understands the use of this metaphor as an effort to describe the potential danger that Plaintiff and Dr. Gilchrist believe to be inherent in the valves. While sympathetic to Defendant's concern that the use of such a powerfully descriptive phrase may lead to prejudice, the Court is quite capable of distinguishing rhetoric from reality.  Since the Rule 403 balancing test favors admissibility, and since in the case of a bench trial it is reasonable to believe that the trial judge will not be moved by improper inference, the "ticking time bomb" metaphor will be included, and Defendant's motion as to Dr. Gilchrist is denied.

### B. The Testimony of John J. Bado

Plaintiff relies on the expert testimony of another witness, John J. Bado, a former Integrity employee, to provide support for the proposition that Integrity's handling of the valve claims was reasonable and that the claims allowances were made in good faith. Pl. Ex. 1, at 3.  Mr. Bado's testimony further serves to provide general information on insurance industry custom and practice.  Id.

Mr. Bado has spent 34 years working in the insurance industry.  Id. at 2.  His experience includes both direct

insurance and reinsurance.  Id.  He has managed claims, managed
reinsurer inquiries and audit reviews, acted as liaison between
claims departments and reinsurers in order to make certain that
reinsurers honored their contractual obligations, and he was
"also responsible for keeping the departments current in legal
developments that would affect the insurer/reinsurer
relationship."  Id.

Defendant contends that Mr. Bado's testimony is inadmissible
under Rule 702, on the basis that it contains legal conclusions
and personal opinions.  Because Mr. Bado is not a legal expert,
the Defense argues that this type of testimony falls outside of
his area of expertise.  Def. Br. at 3.  Additionally, Defendant
argues that Mr. Bado's opinion that Dr. Gilchrist's testimony was
"more credible" than the testimony of Dr. Haft, is inadmissible
as a matter of law.[5]  Def. Br. at 18.

---

[5]Defendant further argues that Mr. Bado's conclusion that a
date of implant trigger is reasonable was based on Dr.
Gilchrist's testimony that valve recipients suffer bodily injury
at implant because they did not receive the benefit of their
bargain.  Def. Br. at 18.  Defendant contends that this
conclusion cannot be admitted because the evidence on which the
conclusion is based, Dr. Gilchrist's opinion, is, itself,
inadmissible.

The Court notes, first, that this contention has been
rejected, as per the conclusion, part III(A)(1) supra, that Dr.
Gilchrist's testimony is admissible.  However, even if the
benefit of the bargain testimony was inadmissible, Rule 703 of
the Federal Rules of Evidence provides that, if the underlying
facts or data are the type "reasonably relied upon by experts in
the particular field ... the facts or data need not be admissible
in evidence in order for the opinion or inference to be
admitted."  Insurance claims experts reasonably rely on the
opinions of doctors in their evaluations of claims, and Mr.
Bado's conclusion should be permitted, irrespective of the

## 1. Legal Conclusions and Personal Opinions

The rule against the admissibility of legal conclusions is well-settled.  "The district court must limit expert testimony so as to not allow experts to opine on 'what the law required' or 'testify as to the governing law." Casper v. SMG, 389 F.Supp.2d 618, 621 (D. N.J. 2005) (quoting U.S. v. Leo, 941 F.2d 181, 196-97 (3d Cir. 1991)).  Testimony as to business custom and practice, however, is admissible.  Id.  The question now facing the Court is whether the testimony sought to be excluded actually contains legal conclusions, or whether Mr. Bado's conclusions are simply those that would be reached by any insurance professional with similar length and breadth of experience.

Defendant argues that Mr. Bado's opinion as to Integrity's reasonableness and good faith in allowing Pfizer's coverage claims based on the application of a date of implant trigger amounts to a legal conclusion and is therefore inadmissible. Def. Br. at 16.  Mr. Bado's testimony includes a discussion of a hypothetical liquidation court, which, if presented with a claim that was "arguably" covered under a reinsurance policy, would require payment by the reinsurer.  Tr. May 31, 2005, at 7.73.  He also opines that the Integrity liquidation court would not have given much weight to the California court's decision in Dairyland (where the date of implant trigger was specifically rejected with regard to a valve-related claim), because the actual decision

_____

admissibility of Dr. Gilchrist's testimony.

pertained to only one claim out of many that were brought in that action.  (The others settled.)  <u>Id.</u> at 7.74-78.  Mr. Bado's opinion is that a liquidation court reviewing the <u>Dairyland</u> litigation would examine the sum total of the litigation, not just a small piece of it.  <u>Id.</u>

Defendant contends that under the "follow the fortunes" doctrine, which binds a reinsurer to reimburse the reinsured (the insurer) for the reasonable, good faith payments made by the insurer to a policyholder, a reinsurer is required to make payments only for those claims that are within the scope of the policy.  Def. Br. at 16.  Since the hypothetical claim that was settled by the hypothetical liquidation court in Mr. Bado's testimony was only "arguably" within the policy, Defendant argues that Mr. Bado's opinion is based not on experience and expertise in the insurance/reinsurance industry, but rather on his own personal understanding of the law.[6]  <u>Id.</u>  Defendant also contends that Mr. Bado's opinion as to whether and to what extent a liquidation court would consider the findings of another court in making its decision amounts to a legal conclusion.  Def. Br. at 17.

To some extent, Mr. Bado's opinions do, indeed, sound like legal conclusions.  During his thirty-four years' experience in

---

[6]While Defendant's brief addresses the irrelevance and unreliability of several other pieces of Mr. Bado's deposition testimony, those pieces of testimony do not appear in the trial transcript.  The Court thus limits its discussion to the alleged legal conclusions discussed above.

the insurance/reinsurance industry, Mr. Bado's responsibilities
included claims management, litigation management, and "executive
responsibility for both direct insurance and assumed reinsurance
claims."  Pl. Ex. 1, at 2.  His professional duties thus required
an understanding of the applicable laws and the ways in which
their interpretation by the courts affects the insurance
business.  Since the custom and practice of the insurance
industry includes periodic settlement of claims disputes by
courts, Mr. Bado's testimony sounds less like an impermissible
legal conclusion or personal viewpoint than like the type of
knowledge that would be possessed, or the type of conclusion that
might be reached, by any similarly situated insurance
professional.  Opinions that are based on this type of
generalized understanding of the laws affecting a single business
or industry are not necessarily the types of legal conclusions
sought to be excluded from evidence.

In United States v. Fogg, for example, the Fifth Circuit
Court of Appeals admitted testimony by an Internal Revenue
Service agent, who opined that certain money would be considered
a "constructive dividend to the taxpayer." 652 F.2d 551, 556-57
(5th Cir. 1981).  The court explained: "[The witness] merely
stated his opinion as an accountant, and did not attempt to
assume the role of the court. . . . In this day and age, any
accountant who lacks adequate knowledge of the tax laws is
risking liability for malpractice."  Like the agent in Fogg, Mr.
Bado's chosen profession requires a certain understanding of a

-23-

specialized area of law.  Where an expert is opining as to the
custom and practice of a particular business, and where someone
who is an expert in a particular field would be expected to
understand the ways in which the laws affect the business, such
testimony should be admitted.  See U.S. v. Leo, 941 F.2d at 196-
97 (finding that expert witness testimony limited to "an
explanation of business custom ... was relevant both to explain
the practice of the industry in which this prosecution arose and
to establish what someone with ... extended background in the
industry probably would know.  The district court took care to
limit [the witness's] testimony so that he was not giving his
opinion as to what the law required ...").  Here, Mr. Bado's
testimony does not reach what the law requires, but rather,
touches upon what a person familiar with the custom of the
insurance industry would believe to be the impact of the law upon
the business.

Moreover, the purpose of the rule excluding expert opinions
on legal issues is to avoid confusing the jury or usurping the
role of the judge in instructing the jury on the relevant law.
See Crowley v. Chait, 322 F. Supp. 2d 530, 550 (3d Cir. 2004)
("While it is impermissible for a witness to testify as to the
governing law since it is the court's duty to explain the law to
the jury . . . [t]he Court has no intention of allowing any
expert in this case to usurp its rightful role to instruct the
jury on the law.").  Where, as here, there is no jury to

-24-

instruct, the ability of the witness to "stray[] out of bounds and into the rightful territory of the Court" is significantly lessened.  Id.  If the Rule 403 balancing test tilts to the side of admission in the case of a bench trial, it would follow that the rule against legal conclusions should become less stringent in the case where the factual findings are to be made by the Court.  Insofar as Defendant believes Mr. Bado's testimony to be incorrect, Defendant has had the opportunity to discredit it. Likewise, if a legal proposition is off-track, it will not get back on track based solely on Mr. Bado's understanding of it. The value of this expert testimony, if any, lies in its ability to provide the Court with a deeper understanding of the custom and practice of the insurance/reinsurance industry.  This part of Defendant's motion as to Mr. Bado is therefore denied.

### 2. Credibility of Another Witness

Defendant further moves to exclude Mr. Bado's opinion that he found Dr. Gilchrist's testimony "more credible" than that of Defense expert Dr. Haft.  Def. Br. at 18.  Defendant is correct that Mr. Bado is not competent to testify as to another witness's credibility.  See e.g. In re TMI Litig., 193 F.3d 613, 666 (3d Cir. 1999) ("Once admissibility has been determined, then it is for the trier of fact to determine the credibility of the expert witness.); United States v. Scop, 846 F.2d 135, 142 (2d Cir.

1988) ("[E]xpert witnesses may not offer opinions ... based on their personal assessment of the credibility of another witness's testimony.  The credibility of witnesses is exclusively for the determination by the jury, and witnesses may not opine as to the credibility of the testimony of other witnesses at the trial.") (rev'd in part on other grounds, 856 F.2d 5 (2d. Cir. 1988)) (internal citations omitted); United States v. Basroon, 38 Fed. Appx. 772, 777 (3d Cir. 2002) (finding that an expert witness's comment on the inadequacy of the *basis* of another witness's opinion did not violate the "prohibition on expert opinion as to the credibility of a witness.").

The Court therefore grants Defendant's motion to exclude Mr. Bado's opinion of Dr. Haft's credibility.


**IV. Plaintiff's Motion**

Plaintiff seeks to exclude the testimony of Defense expert, Dr. Jacob Haft.  Dr. Haft's qualifications include more than thirty years of private practice in the area of cardiovascular disease and twenty-four years as the Director of the Cardiology Department of St. Michael's Medical Center in Newark, New Jersey. Def. Ex. 19.  Dr. Haft graduated *cum laude* from Harvard University, received his medical degree from Columbia University, and has been a Professor of Medicine at Seton Hall University's Post Graduate School of Medicine in South Orange, New Jersey,

-26-

since 1987.  Id.   He has published an extensive collection of papers and abstracts on various topics within the field of cardiology.  Id.

Regardless of Dr. Haft's experience as a cardiologist, Plaintiff argues that he is not an expert with respect to the Shiley valve, and in fact, that his knowledge of the valve is "based on nothing more than second hand knowledge and what he reads in the newspapers." Brief in Support of Plaintiff's Motion *in Limine* (hereinafter Pl. Br.) at 11.  Because Dr. Haft is not a surgeon and has never implanted or removed a valve–Shiley or otherwise–Plaintiff contends that he is not qualified to present expert opinions on whether a bodily injury occurs at implant.[7] Def. Br. at 12.

The Rule 702 qualification requirement stipulates only that a witness must be "qualified as an expert by knowledge, skill, experience, training, or education."  "Under Rule 702, a witness may be qualified as an expert by virtue of any one such factor, or upon a combination of any of the five factors."  GRAHAM, HANDBOOK OF FEDERAL EVIDENCE § 702.2 (5th ed. 2001).  "Liberality and flexibility in evaluating qualifications should be the rule; the proposed expert 'should not be required to satisfy an overly

---

[7]Plaintiff also makes the argument that Dr. Haft's testimony regarding the occurrence of bodily injury is irrelevant in light of the In re Silicone decision.  As discussed in part II, supra, the Court disagrees with Plaintiff as to the persuasive power of the Minnesota case, and therefore, with the Plaintiff's contention that Dr. Haft's testimony is irrelevant on that basis.

narrow test of his qualifications.'" <u>Id.</u> (quoting <u>Gardner v. General Motors Corp.</u>, 507 F.2d 525, 528 (10th Cir. 1974)).

The Third Circuit has embraced this liberal interpretation, stating that "Rule 702's liberal policy of admissibility extends to the substantive as well as the formal qualification of experts.  We have eschewed imposing overly rigorous requirements of expertise and have been satisfied with more generalized qualifications." <u>In re Paoli R.R. Yard PCB Litig</u>., 35 F.3d at 741.  Furthermore, "it is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the *best* qualified or because the proposed expert does not have the specialization that the court considers *most* appropriate.  If the expert meets liberal minimum qualifications, then the level of the expert's expertise goes to credibility and weight, not admissibility." <u>Kannankeril v. Terminix Int'l, Inc.</u>, 128 F.3d 802, 809 (3d Cir. 1997) (emphasis added) (internal citations omitted).  The extent to which the Court finds Dr. Haft's qualifications questionable will thus affect the weight it accords to his testimony, not its admission. <u>Id.</u>

Applying this precedent of liberality to Dr. Haft's qualifications, the Court concludes that, although he is not a specialist in issues relating specifically to the Shiley heart valve, his expertise in the field of cardiology renders him more than adequately qualified to testify as to whether and when injury to the heart may be said to occur.  That Plaintiff's

expert has more familiarity with the Shiley valve does not serve to preclude Dr. Haft's testimony.  Dr. Haft's long and distinguished career as a cardiologist has provided him ample opportunity to learn about heart injuries relating to natural and prosthetic heart valves.  It is this knowledge that he brings to his opinion.

In his report, Dr. Haft opines that bodily injury occurs not when a prosthetic heart valve is implanted, but rather at the moment of "clinical deterioration, onset of severe anxiety or elective valve replacement."  Def. ex. 18, at 1. Dr. Haft bases his opinion on his clinical and practical understanding of the workings of the heart.  His report sets out in detail the physiology of heart valve failure and the ways in which a replacement valve, even a valve that might later be found to be imperfect, is beneficial for the patient.  Id. at 1-5.

Although Plaintiff correctly asserts that Dr. Haft has not implanted or extracted a Shiley Valve *himself*, his practice has included the treatment of patients who may have been candidates for valve replacement surgeries during the time the Shiley valve was on the market, as well as recommendations of this particular valve in cases where valve replacement was deemed to be necessary.  Tr. June 1, 2005, at 9-17.  In his testimony, Dr. Haft explained that at the time the Shiley valve was on the market, it was believed to be the best prosthetic heart valve available, and even if it was known not to be perfect, implanting it was believed to be a better alternative than doing nothing.

-29-

Id. at 29-30, 35.  Since this opinion is based on the doctor's professional experience – in the same way as Dr. Gilchrist's opinion on the inherently defective nature of the valve was reasonably based on his professional experience – it is sufficiently reliable as to be admissible under Rule 702.

Dr. Haft also bases his opinion on a study conducted by William J. Blot, et al., which revealed that the rate of strut fracture in United States Shiley valve recipients was about .06% and the fracture rate in the United Kingdom, which was the worst, was about .18% per year.[8]  Tr. June 1, 2005, at 67-68; Defendant's Brief in Opposition (hereinafter Def. Opp. Br.) at 8. Since the failure rate is quite low, he reasoned, the vast majority of patients who have received valves have not been injured in any way at all.  Def. Ex. 18, at 5.  This study forms a reasonable basis for Dr. Haft's opinion that patients who receive valves are not injured at the time of implant because in the majority of instances, the valves do not fracture.  Although Plaintiff's expert does not agree with its conclusion, Plaintiff does not challenge the reliability of this study's methodology. There is no rule compelling the Court to refuse to admit an expert opinion simply because the opposing party disagrees with its conclusion.  Dr. Haft's testimony will therefore be admitted,

---

[8]The results of this study were published in the Mar. 2001 edition of the Journal of Heart Valve Disease.  The study followed more than 15,000 Shiley heart valve recipients over eighteen years and concluded that only .06% of United States recipients had experienced outlet strut fracture. Def. Ex. 21.

and Plaintiff's motion is denied.

## V. Conclusion

For all of the foregoing reasons, Plaintiff's motion is **denied**, and the testimony of Dr. Jacob Haft shall be admitted. Defendant's motion is **denied** with respect to Dr. Gilchrist, and his testimony shall be admitted.  Defendant's motion with respect to Mr. Bado, however, is **denied** in part and **granted** in part. Testimony from Mr. Bado relating to the credibility of Dr. Haft shall be excluded.


SO ORDERED.


Dated March 28, 2006


                                  /S/ WILLIAM G. BASSLER
                                  William G. Bassler, U.S.S.D.J.