UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

KAREN L. SUTER, The Commissioner of
Banking and Insurance of the State of
New Jersey, in her capacity as
Liquidator of Integrity Insurance
Company,

        Plaintiff,

v.

GENERAL ACCIDENT INSURANCE COMPANY OF
AMERICA,

        Defendant.

Civ. No. 01-2686 (WGB)

**O P I N I O N**

**APPEARANCES:**

SILLS CUMMIS EPSTEIN & GROSS
BY:  Thomas S. Novak, Esq.
     Mark S. Olinsky, Esq.
     Elisa M. Pagano, Esq.
The Legal Center
One Riverfront Plaza
Newark, New Jersey 07102-5400

     Counsel for Plaintiff

BUDD LARNER
BY:  Vincent J. Proto, Esq.
     Joseph J. Schiavone, Esq.
150 John F. Kennedy Parkway, CN 1000
Short Hills, New Jersey 07078-0999

     Counsel for Defendant

**BASSLER, SENIOR DISTRICT JUDGE:**

    This case breaks no new legal ground, but rather involves

the application of well settled principles of insurance law. Its

genesis arises out of the manufacture and sale by Pfizer Inc. of

the Shiley heart valves. Faced with numerous law suits[1] alleging malfunction or fear of malfunction of the heart valves, Pfizer settled a large class action in 1992. Pfizer agreed to pay hundreds of millions of dollars on account of claims by valve recipients, whose valves had not failed, but who claimed to suffer anxiety about the prospect that they would fail.  Pfizer did not actively pursue coverage from Integrity until early 1999.

Transit Casualty Company had issued umbrella liability policies.  The settlement included claims by people with working valves for fear of anxiety that the Shiley heart valve might sometime fail in the future.  Above Transit was Integrity Insurance Company, a high level excess carrier, which paid the limits of its policy and in turn looked to the defendant General Accident Insurance Company as its reinsurer for payment under the reinsurance doctrine of "follow the fortunes" or more precisely, "follow the settlements."  In other words, Integrity allowed anxiety claims that did not arise during the policy period based on when the Shiley valve was implanted, which was during the policy period.

General Accident refused payment, contending that Integrity did not act reasonably or in good faith in allowing coverage for claims of anxiety under policies issued in 1982 and

---

[1] Pfizer never tendered the claims to its insurers for defense, choosing to defend the claims itself and later seek reimbursement for defense costs.

1983 on the basis of a date of implant trigger.  If a valve was working then no injury occurred when it was implanted.  General Accident also argued that the law of reinsurance exempts a reinsurer from the doctrine of "follow the settlements" when a reinsurer, as here, did not take all proper and businesslike steps in allowing the claim.

To determine whether General Accident's denial of coverage was proper, presents the Court with an inherent tension between two legal principles: to preserve the doctrine of "follow the settlements," this Court cannot conduct a de novo review of the settlement between Pfizer and Integrity; on the other hand, to protect the contractual intent of the parties, the Court is required to reexamine the settlement to determine whether the claim represents a risk that was reasonably within the scope of the original policies.  See North River Ins. Co. v. Cigna Reinsurance Co., 52 F.3d 1194 (3d Cir. 1995).

This matter was tried without a jury from May 17 to July 5, 2005.[2]  The Court has jurisdiction pursuant to 28 U.S.C. § 1332, and venue is proper under 28 U.S.C. § 1391.

## I. Introduction and Procedural History

Karen L. Suter, the Commissioner of Banking and Insurance for the State of New Jersey, instituted this action in her

---

[2] During this period, the Court took eighteen days of trial testimony.

3

capacity as Liquidator of the Estate of Integrity Insurance Company ("Integrity"), to recover more than three million dollars under the facultative reinsurance certificates issued by Defendant General Accident Insurance Company of America ("General Accident"). A summary of the relevant filings follows.

Originating in the Superior Court of Bergen County, New Jersey, the case was removed to this Court by Defendant in June 2001. In September 2004, this Court denied both parties' motions for summary judgment and also denied without prejudice the motions of both parties' to preclude expert testimony. See Suter v. General Accident Ins. Co. of Am., No. 01-2686, slip op. (D.N.J. Sept. 30, 2004). The bench trial commenced May 17, 2005. After the conclusion of the trial testimony, but before closing arguments on June 2, 2006, the Court issued a Memorandum Opinion in response to previously renewed in limine motions of the parties, denying the Plaintiff's and denying in part and granting in part the Defendant's. See Suter v. General Accident Ins. Co. of Am., No. 01-2686, 2006 WL 842365 (D.N.J. Mar. 30, 2006).

## II. Findings of Fact

These findings of fact constitute the Court's final determination of contested factual issues, and they therefore supersede any prior recitation of facts in opinions or comments from the Bench. The Court makes these findings of fact pursuant to Fed. R. Civ. P. 52. To the extent that any of the findings of

fact might constitute conclusions of law, they are adopted as legal conclusions.  Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as factual determinations.[3]

After the close of testimony, the Court invited each party to submit its own proposed findings of fact.  The Court has now carefully reviewed those submissions, the documentary evidence, the testimony presented at trial, and the logical inferences that may be reasonably drawn therefrom.  Having considered all of the information before it, the Court sets forth its findings of fact based on its independent review of the evidence.[4]

Where the Court has made a factual finding, it has been made

---

[3] In evaluating the evidence of record, the Court has assessed the credibility of each witness separately, and then determined the appropriate weight to be assigned to his testimony, based on an appraisal of his credibility. "Credibility involves more than a witness' [sic] demeanor and comprehends an overall evaluation of testimony in the light of its rationality or internal consistency and the manner in which it hangs together with other evidence."  Wright & Miller, Federal Practice and Procedure:  Civil 2d § 2586 (1995).  The Court has therefore taken into account not only the witness's manner while testifying, but also whether the witness may have an interest in the outcome of the case, any potential bias or conflict of interest, and whether the witness's testimony was contradicted by some prior statement or action of that witness or any other, or by other evidence.

[4] The Court uses the parties' proposed factual findings merely for assistance in organizing the information.  See Wright & Miller, Federal Practice and Procedure: Civil 2d § 2578 (1995) ("Proposed findings submitted by counsel are no more than informal suggestions for the sole purpose of assisting the court.").

by a preponderance of the credible evidence.  Many of the historical facts, of course, are not disputed.

**A. The Parties**

Prior to the institution of delinquency proceedings in December 1986, Integrity Insurance Company ("Integrity") was a stock insurance company organized under the laws of the State of New Jersey and authorized to do business in all fifty states and the District of Columbia.  (Joint Final Pretrial Order Stip. ("JFPO") at ¶ 1.)  On December 30, 1986, the Honorable William C. Meehan, J.S.C. (the "Liquidation Court") issued an Order (the "Rehabilitation Order") placing Integrity into rehabilitation pursuant to N.J.S.A. § 17:30C-1, *et seq.* (the "Liquidation Act"). (Id. at ¶ 2.)

On March 24, 1987, Judge Meehan issued an Order (the "Liquidation Order") declaring Integrity insolvent, placing it in liquidation pursuant to the Liquidation Act, and appointing the New Jersey Commissioner of Insurance and successors in office as Liquidator of Integrity.  (6/7/05 Trial Transcript ("T. Tr.") at 77:08-77:20.)  Pursuant to the March 24, 1987 Liquidation Order and the July 8, 1987 Order of the Liquidation Court, the Liquidator's allowance of a claim, if not objected to within 60 days, becomes the final judgment of the Superior Court of New Jersey.  (Pl. Exhs. 21, 22.)

General Accident[5] is an insurance company authorized to write insurance in New Jersey.  It is organized under the laws of the State of Pennsylvania, and its principal place of business is in Boston, Massachusetts.  (JFPO at ¶ 3.)

## B. Integrity's Insurance Policies and General Accident's Reinsurance Agreements

Pfizer, Inc. is a major corporation primarily engaged in the pharmaceutical business.  Its corporate office is located in New York City.  (Id. at ¶ 4.)  Pfizer purchased liability insurance as part of a layered program with total occurrence and aggregate limits exceeding $100 million in each policy year, from October 1, 1978 through October 1, 1985.  (Id. at ¶ 5.)  In each of those policy years, Integrity was an excess carrier[6] of Pfizer.  (Id. at ¶ 6.)  The lowest attachment point of any Integrity excess policy was $55 million in excess of a $10 million self-insured

---

[5] It is now known as Pennsylvania General Insurance Company.

[6] Excess policies are designed to cover the liabilities that run in excess of a primary insurance policy.  See Suter v. General Accident Ins. Co. of Am., No. 01-2686, slip op. at 6 (D. N.J. Sept. 30, 2004).  Where a primary insurer's coverage of a loss exists at the "first level" (after satisfaction of any deductible), an excess insurer's coverage is activated "only after the magnitude of the loss exceeds the limits of applicable 'primary' insurance.  Many policies (especially umbrella/catastrophe policies) are explicitly written to be excess insurance for most or all coverages under the policy, and make specific reference to 'underlying' coverages that must be exhausted before the excess policy will provide coverage."  Id. (quoting Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 1:4 (3d ed. 2003)).

retention ("SIR") and $65 million of underlying policy limits. (5/18/05 T. Tr. at 32:15-23.)

Integrity Policy No. XL 206632, which was effective October 1, 1982 through October 1, 1983 (the "1982 Integrity Policy," or the "1982 Policy"), was just such a policy, attaching $65 million in excess of a $10 million SIR and $65 million of underlying insurance policy limits.  (JFPO at ¶ 7.)  The 1982 Policy further provided $3 million in occurrence and aggregate limits as part of a $40 million layer shared with several other insurers.  (Id.; see also Joint Exh. 1.)

Integrity Policy No. XL 207895 (the "1983 Integrity Policy," or the "1983 Policy"), which was effective October 1, 1983 through October 1, 1984, attached excess of a $10 million SIR and $65 million of underlying policy limits.  (JFPO at ¶ 8.)  Like the 1982 Policy, the 1983 Policy provided $3 million in occurrence and aggregate limits as part of a $40 million layer shared with other insurers.  (Id.; see also Joint Exh. 4.)

Transit Casualty Company ("Transit"), a property/liability insurer, was placed into liquidation by Order of the Missouri Superior Court on December 3, 1985.  (Joint Exh. 58.) Previously, between October 1, 1979 and October 1, 1985, Transit had issued a total of twenty-four policies to Pfizer.  (Id.) Some of those policies attached below the Integrity policies, while others attached above.  (Id.)

8

Both the 1982 and 1983 Integrity Policies "follow form" to Transit's umbrella liability policies.  (5/17/05 T. Tr. at 11:07-20.)  Transit's two umbrella policies, in turn, followed form to two policies issued by the Insurance Company of North America ("INA"), the insurance company from which Pfizer had purchased primary insurance in each policy year.  (See Joint Exhs. 2, 5.) The INA policies contained a deductible equal to the policy limit liability of $10 million.  (See Joint Exh. 3.)  This arrangement resulted in Pfizer's first layer of insurance consisting entirely of self-insurance.  (See Joint Exhs. 2, 5; see also 5/18/05 T. Tr. at 32:22-25.)

The Transit umbrella policies define "personal injury" as:

> "bodily injury(including death at any time resulting therefrom), mental injury, mental anguish, shock, sickness, disease, disability, false arrest, false imprisonment, wrongful eviction, detention, malicious prosecution, discrimination, humiliation," as well as "libel, slander or defamation of character or invasion of rights of privacy, except that which arises out of any advertising activities and which results in an Occurrence during the policy period."

(Joint Exh. 2.)

The Transit policies define "Occurrence," in pertinent part, as:

> an accident, event or happening including continuous or repeated exposure to conditions which results, during the policy period, in Personal Injury, Property Damage or Advertising Liability neither expected or intended from the standpoint of the Insured . . .  All such Personal Injury, Property Damage or Advertising Injury caused by one event or by continuous or repeated exposure to substantially the same conditions shall be

9

deemed to result from one Occurrence. (Id.)

Under the Transit policies and the Integrity follow-form policies, coverage is not triggered unless personal injury or property damage, caused by an Occurrence, takes place during the policy period.[7] (JFPO at ¶ 12; Joint Exhs. 2, 5; 5/19/05 T. Tr. at 157:14-25, 158:14-17.)  General Accident facultatively reinsured[8] the 1982 and 1983 Policies on a pro rata basis, after specifically deciding to accept the risk.  (Joint Exh. 7.)  The stated reinsurance limit for each policy is a $2 million part of the $3 million limit of both Integrity Policies.  (Id.)  Under the Facultative Certificate, "the liability of the Reinsurer . . . shall follow that of [Integrity] and except as otherwise specifically provided herein, shall be subject in all respects to all the terms and conditions of [Integrity's] policy."  (Id.)

Furthermore, the Facultative Certificate provides that:

---

[7] This type of coverage is called an "occurrence policy." See In re Silicone Implant Ins. Coverage Litigation, 667 N.W. 2d 405, 409 (Minn. 2003) ("Under these occurrence-based policies, coverage is determined by when the alleged bodily injury or property damage took place: all sums related to any such injury or damage that occurred during the policy period are covered by the policy, even if the claim is not asserted until after the end of the policy period.").

[8] "Facultative reinsurance covers only a particular risk or a portion of it, which the insurer is free to accept or not." Christiania Gen. Ins. Corp. v. Great Am. Ins. Co., 979 F.2d 268, 271 (2d Cir. 1992).  By way of contrast, treaty reinsurance "obligates the reinsurer to accept in advance a portion of certain types of risks that the ceding company underwrites."  Id.

> [a]ll claims involving this reinsurance, when
> settled by [Integrity], shall be binding on the
> Reinsurer, who shall be bound to pay its
> proportion of such settlements, and in addition
> thereto, in the ratio that the Reinsurer's loss
> payment bears to the [Integrity's] gross loss
> payment, its proportion of the expenses . . .
> incurred by the Company in the investigation and
> settlement of claims or suits . . . .

(Id.)

## C. The Heart Valve Claims Against Pfizer and Shiley

In the mid-1970s, Shiley Incorporated ("Shiley"), which became a subsidiary of Pfizer in 1979,[9] developed a mechanical heart valve, known as the Bjork-Shiley 60° Convexo-Concave Heart Valve (the "Shiley valve"). The Shiley valve was designed to replace a patient's natural heart valve, in cases where the natural valve had become diseased or deformed.

The Shiley valve consisted of a convexo-concave disc, which sat inside a metal ring and was covered by a sewing ring that a surgeon would suture to the patient's heart in order to hold the valve in place. The disc sat between two wire holders, called inflow and outflow "struts," and opened to a 60° angle to allow normal blood flow into and out of the heart.[10] A fracture in one

---

[9] See O'Hare Dep. Tr. at 14:24-15:05. This Opinion generally uses "Pfizer" to refer to both Shiley and Pfizer. Unless otherwise indicated, the term "Shiley" is used throughout to refer to the Pfizer subsidiary, and not to the pre-1979 independent company.

[10] Pfizer also produced a valve that opened to seventy degrees, but that valve was not marketed in the United States. (Pl. Exh. 11 at 2-3.)

11

of the struts would cause the disc to "escape[] from the ring, causing uncontrolled blood flow through the heart." (Id. at 2.)

A patient receiving a Shiley valve implant would be required to have her chest cut open and her heart stopped. The heart's pumping function would then be taken over by a heart/lung machine, so that the heart could be cut open and the diseased valve removed. The surgeon would then anchor the prosthetic Shiley valve and sew it onto the heart tissue. (5/25/2005 T. Tr. at 45:13-21, 47:12-24.)

The Shiley valve was sold from 1978 until October 1986. (Pl. Exh. 11 at 2.) During that time, the Shiley valve was implanted in approximately 86,000 patients worldwide, including about 40,000 in the United States. (Id.)

It was reported that production of the Shiley valve had been marred by various manufacturing problems, including unmonitored welding practices and an overall lack of quality control and testing. (Pl. Exh. 11, The 1990 Congressional Report, at 8-10.) Between 1980 and 1983, the Shiley valve had been recalled three times "for fractures and changes to the manufacturing or testing procedures." (Id. at 2.) Specifically, a 1983 investigation of Shiley's manufacturing processes found four major weaknesses in the manufacturing and production of the valve: (1) poor controls over the measurement, welding and documentation of critical changes in the valve; (2) little or no commitment to quality

12

concerns; (3) poor process controls in the manufacturing of the valves; and (4) a further design flaw in the 29mm valve, causing it to be under-designed for the pressure to which it would be subjected.  (<u>Id.</u> at 8.)  A 1984 memo written by a member of the investigative team[11] concluded that (1) the welding practice was "out of control [and] not monitored;" (2) "[t]here [was] non uniformity of the [weld] pattern;" and (3) ". . . valves were shipped misaligned because [Pfizer] never inspected for that situation."  (<u>Id.</u> at 8-9.)

The 1990 Congressional Report also discussed a 1985 report issued by Shiley, itself, which identified "outlet strut interference and bimodal closure as factors contributing to strut fracture."  (<u>Id.</u> at 11.)  The Congressional Report went on, however, to cite evidence that Shiley was aware of the problem of interference and closure as early as 1981.  The cited evidence included a deposition statement made by a Shiley Engineering Product Manager that "it was generally agreed that the convexo-concave valve was more difficult to weld than the radial-spherical valve and the stresses in bimodal closure were so great that it was practically a sure thing that the valves would break."  (<u>Id.</u> at 12.)

Nevertheless, there is no evidence that any heart valve claim against Shiley-Pfizer was ever settled or resolved on the

_____

[11] Mr. Henry Andrews of Howmedica.  (Pl. Exh. 11 at 8.)

basis that the claimant suffered bodily injury at the time of the implantation of the heart valve.[12]  See, e.g., Walus v. Pfizer, Inc., 812 F. Supp. 41, 44 (D.N.J. 1993)("Plaintiffs' claims are not the result of a physical injury or some medically identifiable effect linked to a failure of the valve."); Khan v. Shiley Inc., 217 Cal. App. 3d 848, 857, 266 Cal. Rptr. 106, 111 (Cal. Ct. App. 1990)("So long as the valve continues to function, no cause of action exists under any products liability theory."). A retrospective of cases brought against Shiley-Pfizer rejected claims brought under theories of products liability, fraud, negligent failure to warn or strict liability based on failure to warn.  Without evidence of product defect, the Shiley heart valve's allowed propensity for failure would not support recovery for emotional injuries.[13]  There is no reported case and no

---

[12] "Pfizer-Shiley denies any design or manufacturing defects and claims that its heart valves are not any more likely to fracture than other heart valves available on the market." Bowling v. Pfizer, Inc., 143 F.R.D. 141, 147 (S.D. Ohio 1992).

[13] See Farsian v. Pfizer, Inc., 97 F.3d 508 (11th Cir. 1996); Pfizer v.Farsian, 682 So. 2d 405 (Sup. Ct. Ala. 1996); Angus v.Shiley, 989 F.2d 142 (3d Cir. 1993); Burnett v.Pfizer, 864 F. Supp. 25 (E.D. Ky. 1994); Walus v. Pfizer, 812 F. Supp. 41 (D.N.J. 1993); Keath v. Shiley, Inc., No. 1:91CV910, 1991 U.S. Dist. LEXIS 21872 (N.D. Ohio 1991); Spuhl v. Shiley, Inc., 795 S.W.2d 573 (Mo. Ct. App. 1990); Pryor v. Shiley, Inc., 916 F.2d 716 (9th Cir. 1990); Brinkman v. Shiley, Inc., 732 F. Supp. 33 (M.D. Pa. 1989); Kent v. Shiley, Inc., No. 87-6554-E, 1989 WL 88307 (D. Or. 1989); Hagepanos v. Shiley, Inc., 846 F.2d 71 (4th Cir. 1988).  In Kahn v. Shiley, 217 Cal. App. 3d 848, 246 Cal. Rptr. 106 (Cal. Ct. App. 1990), the claim for fraud did survive the motion for summary judgment

evidence in this record that any plaintiff with a functioning Shiley heart valve has ever prevailed against Shiley-Pfizer on the basis that the valve had a propensity to fail.

In 1986, the Shiley valve was permanently removed from the market. (See Pl. Exh. 11 at 2.)

**The Bowling Class Action Settlement**

As the problems associated with the Shiley valves got attention, many valve recipients filed lawsuits against Pfizer, asserting bodily injury and mental distress. One suit, Bowling v. Pfizer Corp., filed in 1991 in the United States District Court for the Southern District of Ohio, included the claims of nine individual plaintiffs who had been implanted with the valve, five of whom were implanted during the period of Integrity's policy. (See Class Action Complaint and Jury Demand, Bowling v. Shiley, Inc., (S.D. Ohio, filed Apr. 19, 1991) ("Bowling Complaint," or "Joint Exh. 9."))

The Bowling Complaint alleged that there were defects inherent in the Shiley valve, causing a propensity for strut fracture. (Id. at ¶ 27.) Almost four hundred instances of such fracture resulted in the deaths of more than 250 people. (Id. at ¶ 23.) Pfizer-Shiley denied any design or manufacturing defects and claimed that its heart valves are not any more likely to fracture than other heart valves available on the market. See Bowling v. Pfizer, Inc., 143 F.R.D. 141, 147 (S.D. Ohio 1992).

The _Bowling_ plaintiffs sought class certification for all persons in the United States who had been implanted with the Shiley valve.  (Id. at ¶ 12.)  The District Court certified the class for settlement purposes.  In evaluating the fairness of the settlement, the Court observed that with respect to the claims for emotional distress about possible product failure the plaintiff class would have "little chance of success if this case were tried on its merits."  _Id._ at 165.  The court also found that at least twenty-seven courts had granted summary judgment to Pfizer on the ground that a plaintiff cannot recover for fear or anxiety that a heart valve may fracture.  _Id._ at 147.  These observations of the Court assume importance in the case before the Court when it comes to evaluating whether Integrity acted in a businesslike manner in allowing Pfizer's claims for anxiety. Nonetheless, Pfizer entered into a settlement with the _Bowling_ class, agreeing to pay hundreds of millions of dollars on account of claims by valve recipients whose valves had not yet failed, but who claimed to have suffered anxiety due to the prospect that they would fail.  (See "Working Heart Valves With Implant Dates," Joint Exh. 13. at P00208-224.)

The _Bowling_ settlement agreement established a fund consisting of two parts.  (See Joint Exh. 13; _see also_ 5/18/05 T. Tr. at 46:01-49:08.)  The first, the Patient Benefit Fund, provides compensation for research and development of diagnostic

16

techniques to identify implantees who may have a significant risk
of strut fracture, as well as research concerning the risks of
valve replacement surgery.  (Id.)  The second part is the Medical
and Psychological Consultation Fund, which provides claimants
with funds to obtain medical and psychological consultation with
respect to their heart valves.  (Id.)

As of March 4, 1999, Pfizer had spent $562 million in
settling claims by valve recipients, and had further expended
$165 million in defense expenses.  (5/17/05 T. Tr. at 107:21-
108:14, 108:24-109:12.)

At the trial, the plaintiff offered the testimony of Dr.
Ian C. Gilchrist[14] in support of its theory that the anxiety
claims triggered the Integrity policies when the heart valves
were implanted.  Dr. Gilchrist testified that the valve, once
implanted, became organically and functionally part of the
patient's body.  Defendant denied this proposition and claims
that the Shiley valve is a prosthetic device that never becomes
part of the patient's heart or body.  (6/1/05 T. Tr. at  48:01-

_____

[14] Dr. Gilchrist also testified as to letters that were
written to doctors during the period when the Shiley valve was on
the market.  According to his testimony, these "Dear Doctor"
letters provided a means through which Shiley and the United
States Food and Drug Administration ("FDA") could present
information on the fractures, on changes being made to the
valves, and on the recall of certain valves "as it became
apparent certain batches may be more prone to failure than
others."  (5/25/05 T. Tr. at 17:05-21.)

12.)[15]

It was Dr. Gilchrist's opinion that the valve failed because of problems with under-engineering, manufacturing and welding, and its shape.  (5/25/05 T. Tr. at 80:12-81:16.)  Interestingly, Dr. Gilchrest made no mention of information presumably given to Transit by Pfizer in support of its implant theory that ". . . the evidence indicates that this gradual breakdown causes blood clotting in and around the disc valve, in turn causing the valve to work less efficiently and eventually fail **or cause a blood clot to dislodge which often results in death** to the heart valve recipient."  (Joint Exh. 50 at PO1183.)

The opinion that the valve becomes part of the body was offered in support of the argument that a defective valve is similar to a diseased valve and so as the valve deteriorates the disease progresses; therefore, it is reasonable to use the date of implant to trigger the Integrity policies.  The difficulty with the opinion is that while it explains what happens when one strut or both break down, it assumes that every Shiley heart valve was defective on implantation.  While there is evidence that some valves failed – even Shiley admitted that (see Kahn,

---

[15] "But that suture ring, that Dacron material then allows the heart's . . . and the body's scarring process to sort of hook into this valve and incorporate the valve into the structure of the heart.  So . . . you end up with a valve that is organically and functionally part of the heart.  It makes the heart whole again."  (5/25/05 T. Tr. 47:25-48:5.)

18

266 Cal. Rptr. 106) - there is no evidence that all or even a
substantial number of the valves were defective.  The Court
credits the testimony of the defendant's expert witness, Dr.
Jacob Haft, that the Bjork-Shiley valve "is still an excellent
valve" and "between 1984 and 1986, there were no problems with
the strut breaking any more."  (6/1/05 T. Tr. at 35:06-14.)  As
Dr. Haft explained, "at the time it was the best valve that was
available.  It had its warts . . . We knew the incidents were
really quite low and it was worth the risk. . . [A]t the time it
was recalled we are talking about 80,000 valves out there.  And
the number of cases at the time, 1986, was like two or three
hundred, which was such a small percentage. . . ."  (Id. at 21-
24, 37:01-06.)  This testimony is actually consistent with
Pfizer's litigation stance.  See Burnett v. Pfizer, 864 F. Supp.
25 (E.D. Ky. 1994)(slight risk of fracture).

    Dr. Gilchrist opined that causing a valve that has a
tendency to fracture to become a part of a patient's heart/body
is, itself, inflicting an injury upon the patient.  (5/25/05 T.
Tr. at 82:02-15.)[16]  If a valve after implantation is identified

---

[16] Dr. Gilchrist went on to elaborate upon the reasons for
his opinion.  (See 5/25/05 T. Tr. at 83:03-05 ("You've given them
a valve that has got a disability to it.  The valve is not
engineered to take the stresses of day-to-day living"); see also
id. at 83:17-84:06 (Although a single fracture does not have an
effect on hemodynamic function of the heart, the patient
nonetheless suffers an injury; as "the standard of care for [a
patient with one leg hairline fracture] would be to have that
valve exchanged as soon as possible.  And if the patient didn't

as defective, there is a logic to that testimony.  But if it is intended to mean that the insertion of a valve that is not defective constitutes an injury, just because some small percentage of valves may fracture in the future, then it makes no sense.  The surgical insult to the human body occasioned by the implantation of a normal Shiley heart valve into the patient does not constitute bodily injury.  (Id. at 119:18-120:03, 122:21-123:12; 6/2/05 T. Tr. at 34:06-12) ("asymptomatic but defective heart valve.")

The Court credits Dr. Haft's testimony that most valves would not fail, that the incidence of rupture decreased with age and that unless the valve fails, which is a very low occurrence, a Shiley valve recipient has not been injured.  (6/1/05 T. Tr. at 68:01-24.)  The court does not accept Dr. Haft's opinion to the extent that a recipient experiencing a one strut failure or a valve identified as defective has not been injured.  The valve with one strut works, but the valve is defective in that it was designed to operate with two struts.  That being said, however, doesn't mean that the language of the insurance policy, read objectively, was intended to cover valves that worked but that could be defective in some way.  The policy didn't insure against an imperfect product.

In discussing the way in which the valve's engineering

---

have an injury, then why are they operating?")).

problems led to the possibility of fracture, Dr. Gilchrist said
that the Shiley valve "didn't benefit from some of the
engineering we know about today . . . and that, it was **probably**
under-engineered for the stress it was going to run into in the
human body." (5/25/05 T. Tr. at 79:16-22)(emphasis added.)  He
further explained that, over time, as a result of repeated
tapping of the valve disc onto the welds, the valve was subjected
to more force than it was engineered to tolerate.  (Id. at 65:03-
07.)  This repeated tapping and pressure on the welds led to the
formation of micro cracks, which were undetectable by x-ray or
otherwise.  (Id. at 60:11-14, 65:11-20.)  If the condition
continued, the micro fractures would coalesce into a strut
fracture.  (Id. at 60:11-14.)

The Court accepts Dr. Gilchrist's testimony in so far as it
explains why the Shiley heart valve fractured when it did.
When the defective Shiley valve fractured, it is reasonable to
theorize that the valve began to deteriorate after implant due to
design and manufacturing defects.  (Id. at 82:02-15, 148:23-
149:05.)

But the Court does not find credible the testimony of Dr.
Gilchrist to support the broader proposition that every Shiley
heart valve was defective, and so regardless of the date of
fracture or the date of experiencing the emotional distress of
fear of failure, the insertion of every Shiley valve is when the

injury occurred or began to occur.

If Dr. Gilchrist's testimony is carefully examined, he is really saying that the Shiley heart valve as compared to a class of non-Shiley heart valves presents a propensity for failure. Some batches may have been under-engineered, others not properly inspected, others not properly welded. All of this explains why a Shiley heart valve fractured when it did.  There is no evidence that every Shiley heart valve or even a large number of them were defective.

The Court credits the testimony of Dr. Haft that the number of failed Shiley heart valves was quite low in comparison to other heart valves at the time they were on the market.  (6/1/05 T. Tr. at 35:03-36:03.)  Moreover, individuals implanted with Shiley heart valves that never failed did not suffer any symptoms of injury to their bodies.  (5/25/05 T. Tr. at 122:21-123:06.)

Aside from Dr. Gilchrist's testimony that the Shiley valve as a class had a propensity to fail,(which is not supported by any statistical or metalurgical evidence other than the doctor's opinion) both medical experts agreed that at the time of implant there was no physical impairment to the human body because the patient is asymptomatic: a medical examination would not disclose any injury or symptoms of an injury.  (Id. at 112:05-08, 112:18-22, 119:18-120:03; 6/1/05 T. Tr. at 40:11-25.)  Moreover, risk of complete outlet strut fracture of each Shiley valve decreases

steadily with the patient's advancing age.  (Joint Exh. 60.)  In
only approximately one percent of the known cases, both struts
would fracture, leading to catastrophic failure of the valve and
severe injury or death to the patient.  (JFPO at ¶ 23.)

In a study of sheep (see Joint Exh. 62), Dr. Gilchrist
acknowledged that the Shiley valves were normal until they
fractured.  (5/25/05 T. Tr. at 128:13-15, 130:06-12.)  And, he
could not identify any individual valve as defective, or as
having a greater than normal possibility of failure.  (Id. at
137:11-16, 155:18-156:02.)

It is true that Dr. Gilchrist did testify that "the valves
as a class [were] under-engineered and therefore defective from
the get-go."  (Id. at 13:03-05.)  But there is minimal evidence
to support that statement.  Dr. Gilchrist acknowledged that "the
overwhelming majority of the Shiley valves implanted in patients"
were functioning normally, i.e., without fractures.  (Id. at
128:19-21.)  Although, he also did say that he did not know
whether the overwhelming majority of the valves that have been
implanted did not have fractures.  (Id. at 134:13-18.)  But he
conceded that "there are a number of people who have valves that
never experienced any fracturing at all."  (Id. at 136:10-15.)
While insisting that replacing a valve with a Shiley valve was
replacing one diseased valve with another, in response to the
question, "Well that assumes that every valve made by Pfizer was

23

defective, and that's something we really don't know, do we?", he concded: "Well we don't know, but the Trust feels that they really can't exclude anyone from having a defective valve. . . ." (Id. at 136:22-24.)

He also stated that there is no reliable technique to know whether a person with a Shiley valve has one with a cracked leg or not. (Id. at 135:05-08.) It is obvious that the converse of that is there are Shiley valves that do not have a cracked leg at all. In fact, in discussing false positives, Dr. Gilchrist acknowledged that there were valves in the population with normal valves that were not cracked. (Id. at 139:20-140:06.) And, finally, Dr. Gilchrist acknowledged that he could not say that any individual Shiley valve was defective in the sense that it had a greater than normal probability of failure valve-by-valve. (Id. at 137:11-18.)[17]

This testimony simply cannot support the proposition that the insertion of a working heart valve was an injury on implantation because the defective valve was like a disease that progressively got worse over time. The issue then as to whether or not a valve becomes part of the body is immaterial - at least as far as the anxiety claims go.

The testimony of Dr. Gilchrist that every valve was

------

[17] And, of course, the Bowling class action settlement did not pay a patient just because the patient had a Shiley heart valve.

defective and therefore every implant was an injury is in addition undermined by the consistent and continuous position of Shiley-Pfizer that the Shiley valve was not defective.  In Burnett v. Pfizer, the valve was removed some seven years after the implant and found to be "in perfect working order."  864 F. Supp. at 26. In Keath v. Shiley, Shiley submitted affidavits of two experts to demonstrate that the risk that the valve would malfunction was very low.  1991 U.S. Dist. LEXIS 21872 (N.D. Ohio Dec. 17, 1991).  In support of its motion for summary judgment in Kahn v. Shiley, 217 Cal. App. 3d 848, 266 Cal. Rptr. 106 (Cal. Ct. App. 1990), Shiley's statistical consultant advised the court that the risk of fracture in heart valve recipients in their sixth postoperative year, such as the plaintiff's, was "approximately 0.225 percent per annum.," and another expert for Shiley, a specialist in thoracic surgery, affirmed that the risk of valve fracture decreased over time.  266 Cal. Rptr. at 108.

Plaintiff's argument that the courts did not have the benefit of Dr. Gilchrist's evidence ignores the fact that Shiley-Pfizer did: much of the same information that Dr. Gilchrist had in forming his opinion was in the possession of Pfizer-Shiley's engineers and scientists.  (Id. at 78:21-25, 79:05-13; Pl. Exh. 11.)

As late as 1993, Pfizer was defeating claims for emotional distress on the ground that the working valves were not

defective.  <u>See</u> <u>Walus</u>,812 F. Supp. 41.  Indeed, Shiley-Pfizer's position is independently supported by a study recognized by Dr. Gilchrist entitled "Risks of Fracture of Bjork-Shiley 60-degrees Convexo-Concave Prosthetic Heart Valves," reporting that the rate of failure of the Bjork-Shiley 60-degree valve is .06 per cent. (<u>Id.</u> at 142:20-143:12.)[18]  It is only when it comes to this case that we hear for the first time that the Shiley heart valve is defective "from the get go."[19]

## D. Pfizer's Claims Presentation to Integrity

The claims brought against Pfizer fall into three distinct

---

[18] The plaintiff argues Pfizer's settlement in <u>Bowling</u> as proof of the valves's defects and its consequent liability.  Many are the reasons for settlement.  As the Court noted:  "Moreover, the Defendants have had to defend numerous lawsuits involving the Bjork-Shiley convexo/concave heart valve since the mid-1980's. These lawsuits have caused Pfizer to not only bear legal costs, but also they have diverted the attention of many of its employees away from their usual jobs to deal with litigation.  In addition, the presence of pending litigation, with large sums of compensatory and punitive damages demanded, could jeopardize Pfizer's ability to attract investment."  (Defendant's Memorandum in Support of the Proposed Settlement, doc. 162, attachment 10 Opinion of Professor David Rosenberg, at 8.) (Emphasis added.) "Furthermore Pfizer and Shiley have been the subject of an increasing number of critical news stories and reports. . ." <u>Bowling</u>, 143 F.R.D. at 147-148.  And then there was "the opportunity for corporate peace and the prospect of a litigant class spearheaded by Mr. Chesley," and the decision by Pfizer-Shiley "to try to negotiate a virtual end to the litigation that had been plaguing it for several years." <u>Id.</u> at 155.

[19] Conspicuously absent from this testimony is what it was and when Pfizer became aware of the manufacturing and design defects in the valve that was not already public knowledge in 1990 at the time of the Congressional Committee Report. Other than some vague references to talking with Pfizer engineers.

categories: (a) "fracture" claims, involving persons whose valves
have failed, resulting in severe injury or death; (b) "working
valve" or "anxiety" claims, involving persons who allegedly
suffered emotional distress upon learning, post-surgery, of
alleged defects in the valves (but whose valves have not failed);
and (c) "re-operation" claims, involving persons who qualified
under predetermined medical criteria to undergo a second
operation in which their valves were replaced.  (5/17/05 T. Tr.
at 105:10-106:12.)

The earliest claims against Pfizer were the "fracture"
claims arising out of actual valve failure.  (Id. at 103:21-
104:07.)  It is instructive that Pfizer initially presented those
claims to its occurrence and claims-made insurers on the basis of
a date of fracture trigger of coverage.  (Id.)  According to the
testimony of John Reive, a Senior Claims Examiner for Integrity,
Pfizer then changed its approach and began applying a date of
implant trigger for all claims involving fractures that took
place after October 1, 1985, and for the growing number of
working valve and re-operation claims.  (Id. at 104:15-105:07.)
It continued to apply a date of fracture trigger, however, to any
fractures that took place before October 1, 1985.  (Id.)

Pfizer Corporate Counsel for the Litigation Group and
Insurance Coordinator, Ms. Jean A. O'Hare, testified by
designated depositions that Pfizer shifted to a date of implant

trigger as it learned more about the manufacturing and design defects in the valve, as well as its propensity to deteriorate over time.  The Court does not credit this testimony, particularly in light of Pfizer's refusal to respond to Integrity's request to provide medical evidence that would support a finding of injury during the year of implant.  (Id. at 97:14-25, 109:21-10:4; 5/26/05 T. Tr. at 50:24-51:04, 52:12-14.) It's further undermined by Pfizer's consistent and continuous litigation posture that the Shiley valves were not defective.  Ms O'Hare also said that most of the complaints were silent as to when the plaintiff had sustained injury except to specify implant date.  (O'Hare Dep. Tr. at 64:14-65:06.)

Mr. Reive also testified that another reason for the change to a date of implant trigger was recent case law dealing with coverage of claims for property damage resulting from asbestos, which used a date of installation trigger.  (5/17/05 T. Tr. at 106:20-107:20.)  That reason gets us closer to the truth.  The cases relied on were Maryland Casualty v. W.R. Grace and Co., 23 F.3d 67 (2d Cir. 1994), and Eljer Mfg. v. Liberty Mutual, 972 F.2d 805 (7th Cir. 1992).  (JFPO at ¶¶ 42-43; Joint Exh. 26; 5/17/03 T. Tr. at 103:11-104:14.)  But Mr. Reive was never told by Pfizer that the trial court in the Dairyland coverage action held that these two cases did not support the application of a date of implant trigger to the Shiley heart valve claims.  (JFPO

28

at ¶ 45; Joint Exhs. 10, 12.)

It is inconceivable to this Court that Pfizer's counsel, experienced as they were with the Shiley heart valve litigation, inadvertently did not tell Mr. Reive about the adverse ruling in Dairyland, which was directly on point, while giving him cases that weren't on point.  The maneuver is right up there with the statement of Ms. O'Hare that Pfizer recently learned there was a defect with the Shiley heart valves.  The reasons given by Pfizer for the switch in Pfizer's trigger presentation are just not credible.

At some time Ms. O'Hare also told Mr. Reive that the trigger decisions in two breast implant coverage actions, Dow Corning Corp. v. Continental Casualty Co., Inc., No. 200143, 1999 WL 33435067 (Mich. App. 1999) (per curiam) and First State Ins. Co. v. Minnesota Mining & Mfg., No CX 97-9793 (Minn. Dist. Ct.), as well as Eljer Mfg., supported the application of a date implant trigger to the Shiley heart valve claims.  (Joint Exh. 27; 5/26/05 T. Tr. at 53:04-56:19, 60:03-23.)

**E.  Pfizer Change To a Date of Implant Trigger.**

On February 24, 1999, representatives of Pfizer and the Integrity Estate met at Pfizer's New York City headquarters to discuss coverage for the heart valve and other product claims. (5/17/05 T. Tr. at 101:13-103:04.)  Ms. O'Hare, along with Donna Lamagna, an attorney who worked for Ms. O'Hare, and Harvey

29

Malloy, Pfizer's risk manager, attended that meeting.  (<u>Id.</u> at
101:18-21.)  The Integrity representatives in attendance at the
February meeting were John J. Reive, Richard White (the deputy
liquidator for the Estate), and Laura Camporeale (a claim
supervisor).  (<u>Id.</u> at 101:22-25.)

At the February 24 meeting, Ms. O'Hare presented a general
overview of the valve and other product liability claims,
advising Integrity that Pfizer had approximately $12-$13 million
in valve claims to report under the Integrity excess policies.
(<u>Id.</u> at 102:17-103:02.)  This was part of over $700 million worth
of claims that Pfizer had paid over the last couple of years.
(<u>Id.</u>)  Ms. O'Hare also discussed the settlement of the <u>Bowling</u>
class action.  (<u>Id.</u> at 105:24-106:08.)

Ms. O'Hare further explained at the February 24 meeting that
Pfizer had used a date of implant trigger in presenting its
coverage claims against all policies covering 1979-85, and that
it had settled with all of the solvent insurers.  (Id. at 103:16-
19.)

Incredibly, there was no mention[20] at the February 24

---

[20] Mr. Reive's testimony as to what transpired at the
February 24 meeting does not include any mention of the <u>Dairyland</u>
action.  A memorandum written by Ms. O'Hare memorializing the
Feb. 24, 1999 meeting also does not refer to the <u>Dairyland</u>
action. <u>See</u> Joint Exh. 12.

meeting, however, of the Dairyland[21] insurance coverage action.
Because of the significance of Dairyland, this is as good a place
as any to discuss it.  In Dairyland, Pfizer unsuccessfully relied
on asbestos, property damage, and product incorporation cases in
support for a date of implant trigger.  (See Plaintiff's Fact
Responses at ¶¶ 61-65; Def. Exh. 1 at 3, 9-14; Def. Exhs. 3, 37.)
However, applying California insurance law, the trial court
rejected Pfizer's position and granted the insurer's motion for
summary judgment on the Barillas working valve claim for anxiety.
The Court also denied Pfizer's cross-motion to apply a date of
implant trigger to all working valve claims.  (Joint Exh. 10;
Def. Exhs. 1, 37-39.)  "The Court holds that the evidence
submitted by Pfizer, extracted from a sampling of ten working
valves, is insufficient to establish that the ten claimants or
any others suffered an actual injury prior to their learning
through a television show, or otherwise, that their BSCC valves
might be subject to a fracture problem."  Dairyland, No. 718166,
slip op. at 4.

---

[21] Dairyland Ins. Co. v. Shiley, Inc., and Pfizer, Inc., No.
718166, slip op. (Cal. Super. Ct. Apr. 26, 1996).  (See Joint
Exh. 10.)  Four days after the trial court's decision, the
California Court of Appeals decided Armstrong v. Aetna, 45 Cal.
App. 4th 1, 52 Cal. Reptr. 2d 960 (Cal. Ct. App. 1996), holding
that bodily injury occurs during the period of exposure to
asbestos.  Pfizer moved for reconsideration (Pl. Exh. 43), which
was denied.  (Def. Exh. 39.)  The court reaffirmed its original
conclusion that negligent misrepresentations are generally not
covered occurrences under a liability policy.

Pfizer's counsel sent Integrity a letter dated April 14, 1999, which contained a copy of the settlement agreement from the Bowling class action, as well as coverage charts, detailed loss runs setting forth fracture claims, working valve claims, and re-operation claims by implant date, and statistical reports allocating the settlement by implant date. (See Joint Exh. 13.) This mailing contained a loss run that included financial information on a variety of non-heart valve products.

The April 14, 1999 letter also advised the Integrity Estate that Pfizer estimated that it had incurred a total liability of $920 million of indemnity and expense on the valve claims. Of this amount, which was allocable to the years in which Integrity provided coverage, $660 million had already been paid. (Id.)

The loss runs provided with the letter allocated the paid indemnity and expense for each category of heart valve claim on an implant year basis. Heart valve fractures that occurred prior to October 1, 1985, however, were allocated on a date of fracture basis. (Id.)

The statistical reports provided in the April letter concerned amounts paid and to be paid by Pfizer in accordance with its settlement of the Bowling class action. (Id.)

John Reive reviewed the loss runs provided by Pfizer, checking Pfizer's math as to the losses and expenses allocated to each policy year, and accepted the triggers employed by Pfizer.

32

(See Joint Exh. 29 worksheet.)

**F. Transit's Allowance Under Its Umbrella Policies**

The defendant seek to be relieved of the 'follows the settlements' provision in its facultative certificate because Mr. Reive did not conduct a businesslike investigation into Pfizer's claim against the Integrity excess policies.  This requires an examination into Mr. Reive's review of the Pfizer claims against Transit.  Remember that Transit was the umbrella carrier underlying Integrity's Policies, to which Integrity's Policies followed form.

Transit made its initial allowance for fracture claims in 1991.  (See Barbagallo Dep. Tr. at 49:07-18.)  Transit allowed coverage for fractures occurring prior to October 1, 1985 on a fracture date trigger basis.  Fractures that occurred after that date were allocated on a continuous trigger, under which indemnity and defense costs were spread evenly among the years of Transit's coverage, beginning with the date of implant and ending Oct. 1, 1985.  (See id. at 36:07-23.)  Transit used the compressed coverage block method - losses allocated to the 1985 year that were in excess of total policy limits for that year were rolled back to the 1984 year.  (See id. at 39:22-40:17.)

Pfizer knew that it could not access the hundreds of millions of dollars in occurrence limits under its pre-1985 policies if it continued to present the heart valve claims on the

basis of an injury-in-fact trigger. (JFPO Stip. ¶ 37.)  Pfizer
changed its approach and decided to apply a date of implant
trigger for claims involving fractures that took place after
October 1, 1985 and for the growing number of working valve and
re-operation claims. (JFPO Stip. ¶ 38, JTE-26; 5/20/05 T. Tr. at
85:4-18; 5/26/05 T. Tr. at 4:6-10.) Despite switching to a date
of implant trigger, Pfizer continued to apply a date of fracture
trigger to fractures that took place before October 1, 1985.
(JFPO Stip. ¶ 38; JTE-12; JTE-26; 5/20/05 T. Tr. at 85:4-18;
5/26/05 T.Tr. at 14:6-10.)  The Court credits defendant's
insurance expert, Robert Hall, that in accordance with industry
practice a competent claims handler would not have accepted
Pfizer's reasons for the change; namely, a change in the
understanding of the Shiley valve mechanisms and a change in the
law. (6/21/05 T. Tr. at 13:83:15-84:3.)

Mr. Reive testified at trial that Integrity, itself, did
not, at the time, determine whether the coverage below the 1982
and 1983 Integrity Policies was in fact properly exhausted.
(5/27/05 T. Tr. at 16:11-17:04.)  There is no question, however,
that the only way you can get $75 million of loss in the two
Integrity years is on an implant basis for the anxiety claims.

Transit did not allow coverage for the re-operation claims
based on a date of implant trigger.  Instead, Transit allowed
coverage on the basis of a continuous trigger over a compressed

coverage block, beginning with date of implant, and through
October 1, 1985, with excess losses from October 1985 spilled
back into 1984.  (See Barbagallo Dep. Tr. at 97:22-98:02.)

Although Pfizer was told by Transit of the basis on which
Transit was allowing coverage for heart valve claims (O'Hare Dep.
Tr. at 72:02-73:09, 73:13-74:19), Transit's use of continuous
trigger was merely something that the company did internally for
the purpose of billing its reinsurers (as opposed to a basis upon
which other reinsurers, like Integrity, were meant to determine
their own triggers of coverage).  (6/2/05 T. Tr. at 86:14-24.)

In July of 1999, Mr. Reive conducted a claims review at the
office of Transit Casualty in Los Angeles, where he met with Mr.
Barbagallo.  (5/18/05 T. Tr. at 52:05-08, 51:05-10.)  As a result
of this meeting, Mr. Reive was "fairly well convinced" that the
coverage underlying various of the Transit policies had been
exhausted.  (5/19/05 T. Tr. at 77:19-21.)  During that visit, Mr.
Reive reviewed internal memoranda, coverage opinions and claims
complaints, and discussed Transit's allowance of the Pfizer heart
valve claim with Mr. Barbagallo, who was the person who had been
handling the valve claims on behalf of Transit.  (5/18/05 T. Tr.
at 52:07-53:01.)  Mr. Reive did not, however, make an independent
assessment of whether all underlying coverage had been exhausted.
(5/19/05 T. Tr. at 77:08-79:07.)  Among the claims that were
subsequently allowed by Transit was Pfizer's claim on Transit

Policy SCU956343, which lay above the 1982 Integrity Policy. (See Joint Exh. 58.)

Also during his 1999 trip to California, Mr. Reive obtained a copy of a letter from Jean O'Hare to the Transit Estate, dated June 29, 1993.  The letter advised of the Bowling settlement and analyzed the allegations and status of various valve claims brought against Pfizer, as well as the trigger of coverage issue. (See Joint Exh. 46; see also 5/18/05 T. Tr. at 53:07-18, 54:09-56:21.)

Mr. Reive also obtained an internal Transit memo dated August 25, 1995 during his July 1999 audit/trip.  (See Joint Exh. 50.)  The memo was from Jack Willis to Nino Crusafulli, and it analyzed various valve claims and Pfizer's arguments in support of a date of implant trigger.  (Id.)  It also said that the Transit Estate had retained the law firm of Cozen & O'Conner to review the legal issues surrounding the fracture and working valve claims, and that the firm had concluded that a court could potentially find in favor of Pfizer and require the Transit receiver to allow an amount at least equal to the reimbursement for a portion of the post-10/1/85 strut fracture claims.  (Id.; see also 5/18/05 T. Tr. at 61:06-24, 62:13-65:08, 65:14-21.)

The memo further said that Transit potentially had additional exposure to Pfizer of $103 million on top of the $20 million already allowed.  (Joint Exh. 50.)

36

The August 1995 memo also stated that the anxiety/working valve claims, or at least their defense costs, could be deemed covered claims in Transit's policy years, as they would be considered misrepresentation claims - and the date that the alleged misrepresentation was made was at or near the time of implant.  (See id.)  The memo concluded that "[e]vidence exists that the welded strut fracture begins to breakdown immediately from the time of implant" and "that this gradual breakdown of the strut causes blood clotting in and around the disc valve, in turn causing the valve to work less efficiently and eventually fail or cause a blood clot to dislodge, which often results in death to the heart valve recipient."  (Id. at 3.)

During the July 1999 audit, Mr. Reive also received and reviewed an August 16, 1996 coverage opinion by McCarthy, Leonard, Kaemerrer, Owen, Lamkin & McGovern, counsel to Transit. (See Joint Exh. 52.)  This opinion found support in case law for three different triggers of coverage:  date of implant, date of fracture, and continuous trigger.  According to this opinion, the Missouri Receivership Court had previously indicated that it would apply a continuous trigger, but concluded that date of implant was the appropriate trigger for coverage of expenses in defending claims for working valves, i.e. the anxiety claims. (Id.; see also 5/18/05 T. Tr. at 68:19-69:07.)

The McCarthy Leonard opinion referenced the Dairyland Ins.

37

Co. v. Pfizer, Inc. action, between Pfizer and its solvent insurers, in which the issue was whether there was coverage for valve claims.  Mr. Reive did not discuss this case with Mr. Barbagallo.

Mr. Reive does not recall reviewing any pleadings or other materials from the Dairyland action while he was at Transit. When he returned from California, however, he called Ms. O'Hare to inquire about the Dairyland action.  He asked for a copy of the complaint, but Ms. O'Hare said she did not have it.

Ms. O'Hare told Mr. Reive that the trial court decision was appealed to the California Supreme Court in Dairyland, but that the case was settled before the court rendered a ruling.  (5/8/05 T. Tr. at 83:09-84:09.)  Accordingly, Mr. Reive understood that the dispute between Pfizer and Dairyland had been settled and consequently did not pursue it further.  (Id. at 83:09-84:09.)

 Four days after the Dairyland decision was issued, the California Court of Appeals handed down a decision in Armstrong World Indus. v. Aetna Casualty & Surety Co., 45 Cal. App. 4th 1 (Cal. Ct. App. 1996), in which the court found that the date for trigger of coverage (for asbestos-related claims) was when the asbestos was first installed in the building, because the consequences of asbestos flowing into the air would occur at

38

different times.[22]

Pfizer appealed the <u>Dairyland</u> decision, but, before the
appeal was heard, Pfizer and the other defendant insurance
companies settled on the trigger of coverage issue.   (O'Hare Dep.
Tr. at 102:15-103:14.)

All of the solvent insurers who had assumed risk while the
Shiley valve was on the market, and who were parties to the
<u>Dairyland</u> action, entered into settlements with Pfizer.   (5/18/05
T. Tr. at 83:09-12, 100:13-17.)   Mr. Reive, however, did not
learn until March 2001, that the trial court in <u>Dairyland</u> had
rejected (four years earlier) the application of a date of
implant trigger to the working valve claims.   By the time
Integrity came to this realization, the <u>Dairyland</u> case had been
settled, and Integrity had already allowed coverage based on a
date of implant trigger.

The allowances that were made pursuant to the Transit
Settlement Agreement are set forth in Defendant's Response to
Plaintiff's Proposed Post Trial Findings of Fact and Conclusions
of Law, No. 71.   These allowances are admitted to by Defendant,
with the exception of some minor revisions.[23]

_____

[22] The trial court in <u>Dairyland</u> denied Pfizer's motion for
reconsideration on the basis of the <u>Armstrong</u> decision.   (Def.
Exhs. 38, 39; Pl. Exh. 43.)

[23] "Admitted except that (a) the third column on the second
table should read 'CIGA,' not 'Allowances to Pfizer,' (b) the
allowance to CIGA related to products claims other than the BSCC

At deposition, Mr. Barbagallo testified that Transit allowed and allocated defense costs on working valve claims on the basis of a continuous trigger and a compressed coverage block. (See Barbagallo Dep. Tr. at 40:07-41:16.)

Mr. Barbagallo further testified that he reviewed various working valve claims filed against Pfizer, and that those claims generally alleged that the plaintiff suffered anxiety resulting from the valve shortly after implantation.

As of 1997, Transit had allowed coverage for various valve claims by Pfizer, including Pfizer's claim on Transit policy SCU956618, which lay above the Integrity 1983 Policy.

Pfizer cited to Hancock Labs., Inc. v. Admiral Ins. Co., 777 F.2d 520 (5th Cir. 1985), to support its contention that a date of implant trigger should be used for the valve claims. The Hancock court predicted that the California Supreme Court would adopt the "exposure theory" in determining that bodily injury occurred when an individual was implanted with a contaminated porcine valve, setting in motion the growth of bacteria.

On December 15, 1999, Mr. Reive conducted a financial audit "to do a little due diligence as to whether the numbers that [were] on the loss runs [had] some support." (5/18/05 T. Tr. at 89:01-90:12.) At that time, Mr. Reive reviewed twenty-two claim

_____

Valves, and (c) the allowance to NJPLIGA related to environmental claims." (Defendant's Response to Plaintiff's Proposed Post Trial Findings of Fact and Conclusions of Law, No. 71.)

files with paid losses and expenses, and compared them to
Pfizer's 3N loss runs.[24]  (Id. at 90:01-25.)  Mr. Reive's
research revealed that, for every claim reviewed, "the numbers,
the checks, and the amounts that were paid in the claim files
matched up with what was reported on the loss runs."  (Id. at
89:10-13.)

    The purpose of the financial audit was not to determine
whether the underlying limits had been exhausted by payments made
by Pfizer, and indeed, Integrity did not make an independent
assessment of whether all underlying limits had, in fact, been
exhausted.  (See Joint Exh. 15; 5/19/05 T. Tr. at 77:15-78:04;
see also 5/18/05 T. Tr. at 88:21-91:23.)  Integrity failed to
make an independent assessment. If the implant date is used by
Transit, then Integrity's policies have been penetrated.  But if
an implant date is not used for the anxiety claims, it is not.
(See 5/31/05 T. Tr. at 54:06-55:17; 5/18/05 T. Tr. at 104:18-
105:03.)

    In late 1999 or early 2000, after Mr. Reive's audit of the
Transit claims files, Ms. O'Hare (at Mr. Reive's request)
provided the Integrity Estate with an Affirmation that stated:

> From approximately 1993-97, Pfizer and various of
> its product liability insurers who provided
> coverage in the 1979-85 time period were involved
> in an insurance coverage action entitled *Dairyland*

---

[24] "3N" is the number used by Pfizer to identify the loss
runs.  (See 5/18/05 T. Tr. at 89:18-90:02.)

41

> *Ins. Co. v. Pfizer Inc. and Shiley Inc.* . . . The
> main issue before the court was whether the
> insurance written by these carriers covered
> Pfizer's costs for its heart valve product
> liability claims.  All of the insurers in the
> *Dairyland* action negotiated individual settlements
> with Pfizer and paid Pfizer a sum certain,
> although not necessarily full indemnity limits,
> toward the heart valve claims . . .
> Specifically, all of the solvent insurers who
> provided products liability coverage to Pfizer in
> the years which are the subject of Integrity's
> initial allowance to Pfizer, i.e. 1981-82, 1982,
> 1983-84 and 1984-85, in layers below Integrity or
> at the same layer as Integrity[,] paid Pfizer for
> heart valve claims and were dismissed from the
> *Dairyland* action.

A letter to Mr. Reive from Ms. O'Hare, which was dated January 12, 2000, advised that while no settlement agreement had yet been entered into with Transit,[25] that insurer had allowed Pfizer's claims against various of its policies underlying Integrity's coverage.  The letter did not specify the claims allowed or the trigger of coverage used.  (See Joint Exh. 17; see also 5/18/05 T. Tr. at 102:10-11, 102:25-104:01, 108:14-20.)

It should also be noted that the loss runs provided by Pfizer to Integrity were inconsistent in the treatment of the Shiley heart valve claims and other products liability claims involving other implants and medical devices, including heart valves.  (Joint Exh. 13; Def. Exhs. 32, 33.)  While Pfizer generally presented the Shiley heart valve claims to Integrity on

---

[25] Transit did not reach a settlement with Pfizer until 2001. (See supra Part F; see also Joint Exh. 58.)

42

the basis of an implant date basis, it presented the other products claims on a date of event basis, with the date of event often being identified as a date other than the date of implant. (Joint Exh. 13; Def. Exh. 33.)  For example, the other products loss run listed a loss involving an "Ionescu Tissue Heart Valve" as to which the date of implant was July 11, 1983 (corresponding to 1982 policy year) and the date of event was October 20, 1983 (corresponding to the 1983 policy year).  Pfizer allocated this loss to the 1983 policy year.  (Joint Exh. 13; Def. Exh. 32.)

The only explanation that Plaintiff's insurance expert, John Bado, could give as to why a different trigger of coverage was used for the Ionescu heart valve claims than for the Shiley heart valve claims was that the Shiley valves were the only valves that as a class were deemed defective.  (6/2/05 T. Tr. at 62:11-125.)

There also were other non-Shiley valves and other product failures assigned to date of event and not date of implant. (Joint Exh. 13, Def. Exhs. 32, 33, "CC Heart Valve-Non-Strut Fracture"; id., "Mueller Charnley Hips".)  Mr. Reive attempted to explain the inconsistency between applying a date of implant trigger to some medical device/implant claims, but applying a date of event trigger to other medical device/implant claims (5/20/03 T. Tr. at 62:13-93:06; 5/26/03 T. Tr. at 6:05-8:19, 27:03-28:01) by saying, "We, the biggest difference is, with the Shiley heart valve claims, we've got medical evidence that there

43

is injury upon implantation . . . ." (5/27/05 T. Tr. at 85:10-11.)  But, of course, Mr. Reive had no such medical evidence because he never followed up on Pfizer's failure to respond to his request for it.  All he had was the letter in Transit's file from Jack Willis to Nino Crisafulli, dated August 25, 1995, stating that such "evidence exists."  (Joint Exh. 50 at PO1183.) Pfizer never explained what evidence it had and Integrity never explored why Pfizer never responded.  (5/26/05 T. Tr. at 50:24-51:04, 52:12-14; 5/18/05 T. Tr. at 65:11-66:06.)  As Mr. Reive said, Transit's letter was "enough" for him.  (5/18/06 T. Tr. at 66:06.)

One of the things that Mr. Reive took into account in allowing Pfizer's claims was an internal Transit memo dated August 25, 1996 from Jack Willis to Nino Crusfulli.  But the Willis memo was written before the trial court in the <u>Dairyland</u> coverage action in April 1996 rejected the application of a date of implant trigger to the claim asserted by Ruth Barillos.  (JFPO at ¶ 62; Joint Exh. 10; Def. Exhs. 1, 37.)

During the July 1999 claim audit at Transit, Mr. Reive also received an August 16, 1996 coverage opinion by McCarthy, Leonard, Kaemmerer, Owen, Lamkin & McGoveern, Transit's counsel.  (JFPO at ¶ 63; Joint Exh. 52.)  The McCarthy Leonard opinion discussed three possible triggers:  date of impact, the continuous trigger and the date of fracture with case citations

supporting each.   (Joint Exh. 50; 5/18/05 T. Tr. at 77:07-77:12.)
This opinion letter incorrectly described the trial court's
decision in the <u>Dairyland</u> coverage action, stating that "the
California court has determined that in the context of non-
working valve claims a 'continuous trigger should apply.'"
(Joint Exh. 52 at PO1063; 5/19/05 T. Tr. at 123:21-124; 5/31/05
T. Tr. at 93:23-94:17.)

     This opinion letter was one of the things that Mr. Reive
relied on in deciding to allow coverage for the Shiley heart
valve claims on the basis of a date of implant trigger.   (5/18/05
T. Tr. at 68:12-73:03.)

     The opinion letter is misleading in another, more serious
way and underscores the significance of Integrity not obtaining
its own coverage counsel.   At page three, the opinion letter
states:

> In regard to the working heart valve claims, it
> has been determined that negligent
> misrepresentation or fraud regarding these claims
> may be asserted against the insured.   Khan v.
> Shiley, Inc., 271 Cal. App. 3d 848, 266 Cal. Rptr.
> 106 (4th Dist. 1990).   **Based on this holding the
> insured settled most of the working heart valve
> claims,** in a class action settlement, Bowling v.
> Pfizer, Inc., Case. No. C-1-91-256 (S.D Ohio).
> The defense costs associated with these claims can
> be attributed to the continually successful
> defense of indemnity claims in over 30 lawsuits
> before Khan case, as well as the overall
> settlement of these claims after the negligent
> misrepresentation theory placed Pfizer in the
> position of paying such claims on that basis.

(Joint Exh. 50 at PO1063.)

A reading of <u>Bowling</u> demonstrates that that statement materially mischaracterizes the decision.  Nothing in the opinion supports the statement that Pfizer settled because of <u>Khan</u>.  In evaluating the objection that the proposed settlement provided inadequate compensation, the <u>Bowling</u> court, time and time again, stressed the difficulty of recovering for a properly working heart valve and specifically noted "the tall hurdles to mount to actually prevail at trial" under the <u>Khan</u> fraud theory.  Bowling, 143 F.R.D. at 164, 165.

A reading of the <u>Bowling</u> decision alone should have inspired Mr. Reive to insist on getting the medical information he asked for but never got from Pfizer, and to seek out his own counsel as to whether Pfizer's claims could arguably be within the Integrity coverage.

Mr. Reive said that what he was "trying to do, is, Pfizer is coming to us and they want to make a claim.  I got to decide whether or not the claim has got merit and if the allocation methodology that they want to use on this date of implant is acceptable."  (5/18/05 T. Tr. at 16:23.)  The defendant's insurance expert, Robert F. Hall, credibly testified that the proper way to have handled this claim under insurance industry standards was to retain immediately, "competent, first class, first rate coverage counsel to assist [me] in the handling of the claims" . . .  "because the issues are too complex or too

46

complicated for a layman to understand." (6/21/05 T. Tr. at 33:01-34:23, 38:01-05.)

The court also credits Mr. Hall's testimony that, in view of industry standards, Integrity should have retained expert medical advice as to when bodily injury actually occurred. (Id. at 7:15.) The court agrees with Mr. Hall's observation: "That seems to be the critical point that the insurance companies or Integrity would have to resolve before it could make a determination whether there was any claims that got into the Integrity layer." (Id.)

Mr. Hall found revealing, as does the Court, that Mr. Cookman, the claims manager at Integrity Insurance Company, memorialized a telephone conversation he had with general counsel for Pfizer on January 27, 1999: "She expressed a clear understanding of our need to prove up to reinsurerers and suggested that Pfizer will strive to provide all necessary assistance in meeting those needs." (Id. at 45:01-23.) Mr. Hall found it surprising that almost on the first contact to discuss the claim the subject of reinsurance should surface because the reinsurance contract is directly between the insurance company and the reinsurer. (Id. at 46:01-21.) That is because "reinsurance has nothing to do with the merits of the claim and what's owed under the policy." (Id.)

Mr. Hall is right on the money when he observed that

47

"Pfizer cleverly omitted one critical piece of information, and that is that Pfizer lost on the coverage issues and they did not convey that information to Integrity.  Integrity never picked it up.  Never asked the necessary questions to follow-up and obtain the decision and to determine what exactly happened on Pfizer and Dairyland." (5/13/05 T. Tr. 54:1-15.) It doesn't take an insurance expert to conclude, as Hall did, that industry practices would have required a claims handler to make an effort to get a copy of the Dairyland decision, read it, and understand what was at stake and retain the assistance of outside coverage counsel. (Id. 4:1-12.) Mr. Reive never bothered to explore the insurers' overage defenses when it was apparent that carriers settled for less than their policy limits. (Id. 63:20-25.)  When Mr. Reive examined the Transit files he did not determine whether there was any bodily injury claims that occurred during any policy period that validly exhausted all of the underlying carriers below the attachment point of Integrity's policy. Integrity repeated the error of the McCarthy Leonard opinion on the outcome of the Dairyland decision. (Id. 77:4-13.)

The Court credits the testimony of Hall that it was grossly incompetent under the circumstances of this case not to retain competent coverage counsel and to have made an allowance on a claim of this type without obtaining medical information to support it. (Id. 81:4-82:13.)

48

John J. Bado, the Plaintiff's expert on direct insurance and reinsurance,[26] testified that Mr. Reive did make an independent determination of Transit's coverage, and that he found Transit's policy determination to be reasonable.  (6/2/06 T. Tr. at 80:21-82:10.)  Mr. Bado explained that because Mr. Reive independently assessed the reasonableness of Transit's coverage, to which Integrity followed form, his assessment of Integrity's coverage was also reasonable.  The Court does not credit this testimony.

In determining whether to allow Pfizer's claim against Integrity, Mr. Reive relied in part on the claim handling and review conducted by the Transit Estate.  (5/18/05 T. Tr. at 111:10-112:03.)  The Court does not accept the testimony of Mr. Bado that it is custom and practice in the industry for an excess carrier to rely on the claim investigation by the underlying carrier.  (5/31/05 T. Tr. at 53:13-54:03.)

In January 2000, Mr. Reive recommended that Pfizer's claims against the 1982 Policy be allowed in the amount of $3 million, and that Pfizer's claim against the 1983 Policy be allowed in the amount of $2,280,996.  (5/18/05 T. Tr. at 110:02-10, 118:06-22; see also Joint Exh. 18.)  The Integrity Estate accepted this recommendation.  (5/18/05 T. Tr. at 110:02-10.)

When Mr. Reive decided to allow Pfizer's claim based on a

---

[26] Mr. Bado's experience is summarized at page 25 of the JFPO.

49

date of implant trigger, he relied in part on a decision by the
Seventh Circuit Court of Appeals, Eljer Mfg. v. Liberty Mutual.
After an extensive analysis by Judge Posner, the Eljer majority
held that "physical injury to tangible property" occurs when a
defective product is incorporated into a larger structure rather
than when the product malfunctions, causing physical damage to
the structure.  972 F.2d at 814 (Cudahy, C.J., dissenting).

Mr. Reive also relied in part on: (1) a Second Circuit
decision regarding asbestos property damage claims, which found
the date of installation to be the appropriate trigger of
coverage.  Maryland Casualty Co., 23 F.3d 67; and (2) a Michigan
case, Dow Corning Corp., et al. v. Continental Casualty Co. Inc.,
et al., No. 200143-200154, 1999 WL 33435067 (Mich. Ct. App. Oct.
12, 1999), which utilized a continuous trigger, but in which Mr.
Reive thought the court recognized that the occurrence commenced
from the date of implant.  (See 5/18/05 T. Tr. at 112:05-14,
113:13-114:01.)

In determining that a date of implant trigger was
appropriate, Mr. Reive concluded that valve recipients had
received a personal injury within the meaning of Integrity's
policy when they had been surgically opened in order to receive a
defective heart valve, or because they were anguished at the
prospect of valve failure.  (Id. at 42:01-43:08.)

On June 12, 2001, Transit entered into a settlement of

50

Pfizer's remaining coverage claims.  (See Joint Exh. 58.)  The settlement agreement it executed with Pfizer did not specify (1) the basis upon which Pfizer's coverage claims had been allowed; (2) the trigger used in determining coverage and allocating the losses; or (3) the specific underlying claims by valve recipients that had been allowed.  (Id.)  The result of the Settlement Agreement was that Transit allowed Pfizer's claims for coverage of valve losses and expenses in the amount of $71,713,864.  This Settlement Agreement marked the first time that Transit formally denied any claims submitted by Pfizer.  (See Barbagallo Dep. Tr. at 43:18-46:09, 99:5-102:02.)

## G. Integrity's Calculation of Loss

Pfizer has a self-insured retention ("SIR") for the first $10 million of loss - from dollar one to dollar ten million. When Mr. Reive performed his calculations to determine whether the losses allocated to each year exceeded the attachment point, he did not include the SIR in the underlying insurance.  (See 5/26/06 T. Tr. at 79:02-05.)  This was an error.  His 1999 calculations of the losses for years 1982 and 1983 were $3 million and $2,280,996.42, respectively.  Upon discovering his error in 2001, he recalculated the losses using the correct underlying insurance and updated loss runs supplied by Pfizer as of May 2000.  (Id. at 78:09-79:12.)  The 2001 calculations of losses in years 1982 and 1983 were $3 million and $1,913,388,

respectively.  (See Pl. Exhs. 37 and 38.)

When Mr. Reive recalculated the allowances to adjust for the SIR error, he found the total reduction in the claims by Pfizer for all seven policies and all the allowances made by Integrity to be $1.5 million.  (Id.)

According to the updated loss runs for the 1982 policy year, Pfizer allocated $190,874,632.08 in loss for that year.  (Pl. Exh. 37.)  After subtracting the underlying insurance of $75 million, the total paid losses and expenses in excess of underlying insurance allocated to the 1982 policy year was $115,847,632.08.  (Id.)  Plaintiff argues that since the $40 million layer (of which Integrity was a part) had been totally exhausted, Integrity's total allowance was $3 million.

The Court finds (by a preponderance of the evidence standard) that the limits of Integrity's excess layer or the limits underlying Integrity's excess layer have not been properly exhausted because the policies in question only insure for an injury that occurs during the policy period and does not insure for an injury that occurs beyond the policy period; the anxiety claims clearly occurred after the policy period.  (See 5/26/05 T. Tr. at 79:02-81:08.)

Similarly, according to the updated loss runs for the 1983 policy year, Pfizer allocated $100,510,687.75 in loss for that year.  (Pl. Exh. 38.)  After subtracting the $75 million

52

underlying insurance, the total paid losses and expenses in excess of underlying insurance allocated to the 1983 policy was $25,510,687.75.  (Id.)  The $40 million layer had thus been triggered, but not exhausted.  Integrity's share was 7.5% of the $25,510,687.75, or $1,913,388.47.  (Pl. Exh. 38.)

The Court accepts as credible the testimony of Richard White, the deputy liquidator of Integrity.  Mr. White testified that Integrity billed all of its reinsurers on the Pfizer loss, utilizing the date of implant trigger.  (6/9/05 T. Tr. at 05:02-18;[27] see also Joint Exhs. 18, 19, 20, and 22.)  This, however, isn't a substitute for Mr. Reive's failure to properly investigate Pfizer's claims.

On behalf of Integrity, the California Insurance Guaranty Association ("CIGA") entered into a settlement agreement with Pfizer.  (See Joint Exhs. 42, 43, 44, 45.)  The evidence seems to show that CIGA did not really use an implant trigger.  Mr. Bado testified that CIGA used an implant trigger for working valve claims.  (5/31/05 T. Tr. at 50:25-51:05.)  A memorandum from Mr. Reive, dated January 22, 2001, however, indicates that "CIGA did not initially accept and continued to resist allocation of losses based upon a 'date of implant' trigger and/or a 'continuous trigger.'" (Joint Exh. 43.)  Instead, CIGA and counsel to Pfizer

_____

[27]Integrity did utilize a date of fracture trigger in billing defendant on pre-October 1, 1985 fracture claims.  (See Joint Exh. 22.)

"decided that neither position was absolutely correct and made a cost effective compromise settlement . . . There was case support for both positions and both positions had merit." <u>Id.</u>

## H. Integrity's Reinsurance Billings to General Accident

In January 2000, Integrity allowed claims by Pfizer for approximately $10 million against five policies for coverage of valve indemnity and expense on the basis of a date of implant trigger. (JFPO at ¶ 95.) Among the allowed claims were Pfizer's $3 million claim on the 1982 Policy, and Pfizer's $2,280,996 claim on the 1983 Policy. (<u>Id.</u>) General Accident, Integrity's reinsurer, has refused to pay Integrity's billings on the 1982 and 1983 Policies. (<u>Id.</u>)

The actual amount of the billings were as follows:

The allowance on the 1982 Policy was $3 million; General Accident's Fac. Cert. was 66.7% (not to exceed $2 million); the amount that Integrity billed (and claims is due) was $2 million. (Pl. Exh. 47.)

The allowance on the 1983 Policy was $1,913,388; General Accident's Fac. Cert. was 66.7%; and the amount Integrity billed (and claims is due) was thus $1,276,229.80. (<u>Id.</u>)

Defendant admits that this was the amount billed, but denies that the amounts due are actually owing. (Joint Exhs. 36-41.)

## III. Conclusions of Law[28]

As stated earlier in the opinion, this case juxtaposes two legal principles: the doctrine of follow the settlements and the doctrine of contractual intent. The doctrine of follow the settlements  is an embodiment of the doctrine of follow the fortunes in the context of settlement. See Commercial Union Ins. Co. v. Seven Provinces Ins. Co., 9 F. Supp. 2d 49, 66 (D. Mass. 1998), aff'd 217 F.3d 33 (1st Cir. 2000). This doctrine "binds a reinsurer to accept the cedent's good faith decisions on all things concerning the underlying insurance terms and claims against the underlying insured: coverage, tactics, lawsuits, compromise, resistance or capitulation." British Int'l Ins. Co. v. Seguros La Republica, S.A., 342 F.3d 78, 85 (2d Cir. 2003). The doctrine generally "insulates a reinsured's liability determinations from challenge by a reinsurer. However there are

---

[28] Integrity never made a choice of law determination when it allowed coverage for Pfizer's claims regarding the Shiley heart valve.  In its  brief on the motion for summary judgment, Integrity argued that under the law of New York, Pfizer's place of business, New York's injury in fact trigger of coverage applies.  The defendant took no position on the choice of law issue, because the same standard for good faith applies whether this Court employs the laws of New York, the laws of California (Shiley's place of business), or the laws of New Jersey (Integrity's place of business). See Unigard Security Ins. Co. v. North River Ins. Co, 4 F.3d 1049, 1069 (2d Cir. 1993); Montrose Chem. Corp. V. Admiral Ins.Co., 10 Cal. 4th 645 (1005)(California law); Hartford Accident & Indem co. v. Aetna Life 7 Casualty Ins., Co., 96 N.J. 18 (1984) (New Jersey law) During the closing arguments, counsel for both parties agreed that the law of California governs the interpretation of the Integrity insurance policies. (6/2/06 T. Tr. 22:1-3;44:25.)

exceptions: a fraudulent or bad faith determination doesn't immunize a reinsured's determination. Nor do payments that  are clearly beyond the scope of the original policy' or 'in excess of 'the reinsurer's agreed-to-exposure.'" North River Ins. Co. v. Ace Am. Reinsurance Co., 361 F.3d 134, 140 (2d Cir. 2004).

If a reinsured has made a good faith[29] determination that a certain risk was covered by the underlying insurance policy, the reinsurer cannot dispute that determination.  North River Ins. v. Cigna Reinsurance Co., 52 F.3d 1194, 1199 (3d. Cir. 1995); Christiania Gen. Ins. Corp. v. Great Am. Ins. Co., 979 F.2d 268, 280 (2d Cir. 1992).  California law is no different. See National American Ins. Co. of California  v. Certain Underwriters at Lloyd's London, 93 F.3d 529, 535 (9th Cir. 1996). And of course follow the fortunes doctrine applies to both settlements and judgments. North River Ins. Co. v. CIGNA , 52 F.3d 1194, 1205 (3d Cir. 1995).

The ceding insurer is required to make a good faith and a reasonable, businesslike investigation.  If that is done then

---

[29] Good faith is a flexible standard and what the standard of good faith requires depends on the circumstances.  The relationship between ceding insurers and reinsurers is sometimes said to require the "utmost good faith," a legal rule, but "also a tradition honored by ceding insurers and reinsurers in their ongoing commercial relationships." Unigard Sec. Ins. Co. v. North River Insurance Co., 4 F.3d 1049 at 1054, 1069. (2d Cir. 1993).  Whether or not designated as "utmost," "a very high level of good faith" is required so reinsurers don't have to engage in duplicative monitoring. Id.

"the ceding company may bind the reinsurer to follow its settlement fortunes when it concedes that a particular claim falls within the scope of coverage provided by the ceding company's policy." Hartford, 98 F. Supp. 2d at 258.  Although the general rule is that contract interpretation is subject to de novo review, the follow the fortunes doctrine creates an exception. North River v. CIGNA, 52 F.3d at 1206. In reviewing the propriety of the defendant's denial of liability, the inquiry is not whether "the underlying claim was covered by the cedent's policy but whether there is any reasonable basis to conclude there was such coverage." Id. (citing Schoenberg, L'Histoire Ancienne De "Follow the Fortunes", Mealey's Litigation Reports (Reinsurance), May 28, 1992, at 20).

The rationale of the doctrine is to prevent facultative reinsurers "from second guessing good-faith settlements and obtaining de novo review of judgments of the reinsured's liability to its insured." North River v. Cigna, 52 F.3d at 1189 (citation omitted).  Therefore to defeat the presumptive application of "follow the fortunes" doctrine the defendant must meet a high burden. The burden of proof is on the reinsurer to prove bad faith or that the liability was not reasonably within the scope of the original policy. Id. at 1207.  As the reinsurer, the defendant must show bad faith on the part of Integrity, the reinsured. Bad faith in this context amounts to a showing of

gross negligence, recklessness or a showing "that the settlement was not even arguably within the scope of the reinsurance coverage." Hartford Acc. & Indem. v. Columbia Cas. Co., 98 F. Supp. 2d 251, 258 (D. Conn. 2000)(citations omitted).

Are the payments here clearly beyond the scope of the reinsured policy? The answer is yes. The Transit policy defines "personal injury" as "bodily injury . . . mental injury, mental anguish, sickness, disease . . . which results in an Occurrence during the policy period." (Emphasis added.) "Occurrence is defined as "an accident, event or happening including continuous or repeated exposure to conditions which, results, during the policy period, in personal injury." (Emphasis added.) The plaintiff argues that these passages are ambiguous[30] and therefore should be interpreted in favor of the insured. If it is ambiguous, California law requires that as applied to a promise of coverage in an insurance policy it is not the subjective beliefs of the insurer that govern the interpretation of the insurance contract "but, rather, 'the objectively reasonable expectations of the insured." Montrose Chem. Corp. of California v. Admiral Ins. Co., 913 P.2d 878, 10 Cal. 4th 645 (Cal. 1995).

But the language here is clear and explicit that the

---

[30] The parties do agree that the policies are occurrence policies. (6/2/06 T. Tr. 66:8-13 "we agree that the occurrence could occur in any year if the injury occurs in the year of the policy, it's covered.")

policies provide coverage only for an injury occurring during the policy periods.  That would of course include, as the policy provides, "continuous or repeated exposure to conditions which results, during the policy period, in personal injury."  However, the evidence does not and never did support the categorization of the Shiley heart valve as a continuous or progressively deteriorating bodily injury. Even accepting the thesis that all the valves were defective, a defective mechanical device is not a disease.  The language of the policy when read as a whole unambiguously excludes coverage for an injury that occurred after the time period covered by the policies.  The injuries here - the anxiety claims, most of the fracture claims, and the reoperation claims - occurred after the policy period.  Moreover in light of Pfizer's initial interpretation of the policies as to allocation of losses, Pfizer could not have reasonably expected otherwise.

The question, of course, is not whether the claims are within the policy but whether the claims are <u>reasonably</u> within the terms of the policy. It is argued that just as asbestos and silicone progressively harm a person's body, so also a defective heart valve that deteriorates over time also justifies a date of implant as the trigger. That was Pfizer's position. But the problem is that Mr. Reive accepted Pfizer's position  as a medical truth without any medical evidence to support it.

Reinsurance only covers losses that can reasonably be

59

allocated to the years and the insurance policies covered by the reinsurance agreement. <u>North River Ins. Co. v. ACE Am. Reinsurance Co.</u>, 361 F.3d 134, 139-41 (2d Cir. 2004). It simply was not reasonable to put fracture claims, re-op and anxiety claims in the same category as silicone and asbestos based on a theory of injury that has no credible medical evidence to support it.

In the asbestosis and silicone cases, unlike here, there was medical evidence to justify the trigger as the date of initial exposure. Instead of harm, the Shiley heart valve helped.  As Robert Hall testified the decision to use the implant date as the trigger date for fracture valve cases and for valves that worked and performed properly is not even arguably within the terms of Integrity's policy.  (6/21/05 T. Tr. at 101:1-10.)

General Accident as the reinsurer is entitled to rely on principles of contractual intent and cannot be held liable for a kind of loss that it did not agree to cover.  <u>North River Ins. Co, v. CIGNA Insurance Co.</u>, 52 F.3d at 1206-07. It did not agree to reinsure claims that Integrity was not obligated to pay in the policy periods.

A fair reading of the provisions of the Transit policy to which Integrity followed form would never have alerted General Accident that it was re-insuring a claim for a potentially defective valve regardless of whether or not it failed or caused

emotional distress or had to be replaced outside of the period of time covered by the policy. The law as established in all the reported cases denied liability absent a malfunctioning product. Even if Dr. Gilchrest's testimony is accepted that the valve was defective when implanted, these policies, as Mr. Hall explained, are written not to provide coverage for a defective product but rather for a product that "actually causes some bodily injury." (6/21/05 T. Tr. at 101:17-24.)

General Accident did not agree to be held liable for losses arising from bodily injury that occurred outside the policy period of the reinsured Integrity excess policies.  "Certain things are well settled: As a general rule the time of the occurrence of an accident within the meaning of an indemnity policy is not the time the wrongful act is committed but the time when the complaining party is actually damaged." Owens-Illinois, Inc. v. United Ins. Co., 138 N.J. 437, 452; American Home Prods. Corp. v. Liberty Mut. Ins. Co., 748 F.2d 760 (2d Cir. 1984); Montrose Chem. Corp. of California v. Admiral Ins. Co., 10 Cal. 4th 645, 669, 42 Cal. Rptr. 2d 324, 336, 913 P.2d 878, 890 (1995).

Pfizer led Integrity down the proverbial prim rose path. Mr. Reive might be excused for being unaware of Martin v. Edwards Laboratories, 60 N.Y.2d 417, 425-27, 457 N.E.2d 1150, 1154-55 (N.Y. 1983), in which the New York Court of Appeals in analyzing

the statute of limitations held that the trigger for personal injury caused by the malfunctioning of a heart valve is the date of injury resulting from the malfunction, not the date of implantation. ("An implanted or inserted device intended to perform a continuing function, to the contrary, causes no injury until the product malfunctions.") But he cannot be excused from not initially knowing and later ignoring the Dairyland Coverage Action, which is consistent with the legal principles articulated in Martin and other cases holding that "actual damage" must occur during the policy period in order to trigger coverage under the insurance policy.[31]

In support of its position that the claims are arguably within the language of the contract, Integrity cites to Pfizer's and consequently Mr. Reive's supine reliance on Dow Corning Corp. v. Continental Casualty Co., 1999 WL 33435067 (Mich. App. 1999) (unpublished opinion affirming trial court's conclusion that for coverage purposes injury occurred beginning on date of implant of breast implants and progressed continuously); In re Silicone Implant Insurance Coverage Litigation, 667 N.W.2d 405 (Sup. Ct. 2003) (policies triggered at time of silicone gel breast

---

[31] Plaintiff tries to diminish the significance of Dairyland by the unconvincing argument that unlike this case the Dairyland court was not presented with any medical evidence concerning the etiology of valve failure or its effect on the human body. The court can only conjecture that perhaps it was for the same reason that Pfizer never provided any to Integrity.

implantation); <u>Eljer Manufacturing, Inc. v. Liberty Mutual</u>
<u>Insurance Co.</u>, 972 F.2d 805 (1992)(physical injury occurred when
defective plumbing system incorporated into larger structure).

There are several reasons why this line of reasoning is not
applicable to this case. In the first instance the adoption of a
coverage trigger is a question of substantive insurance law.
<u>Maryland v. W.R. Grace and Co.</u>, 23 F.3d 617,624 (2d Cir. 1994).
Mr. Reive acknowledged that he never considered the question of
choice of law. It was unreasonable to rely on out of state cases
to which the Shiley heart valve could be analogous to, while
ignoring the <u>Dairyland Ins. Co.,v. Shiley Inc. and Pfizer Inc.</u>,
Sup. Ct. of Calif. No.718166 March 22, 1996 (JT10), holding that
under California law implantation of the Shiley heart valve was
not an "occurrence" during any of the policy periods and
therefore insurers had no duty to indemnify and specifically
finding that the BSCC working valves to be distinguishable from
the asbestos bodily injury, breast implant injury and product-
incorporation cases which were cited by Pfizer.  The point,
however, is not that one argument is better than another, but
that Mr. Reive simply ignored the significance of this decision
never requested Pfizer to respond and never sought the advice of
coverage counsel.  The case should at least have prompted him to
retain insurance coverage counsel before cavalierly dismissing
it.

Secondly, there must be some proof of injury during the policy period, American Home Prods. Corp. v. Liberty Mut. Ins. Co., 748 F.2d 760, 765 (2d Cir. 1984).  But Mr. Reive had only Pfizer's position but no proof. He took the easy way out and acquiesed in Pfizer's citation of legal cases. But case law is not a substitute for medical evidence. Integrity's payment therefore cannot reasonably be said to fall within the scope of the policies in question.

This determination is not a question of second-guessing Mr. Reive. When it comes to reinsurance, a good faith decision is not subject to de novo review.  But Integrity did have a duty to General Accident as its reinsurer to independently investigate the claim and make a reasonable determination as to whether the heart valve claims should be allowed. Unigard, 4 F.3d at 1054. The efforts that Mr. Reive made didn't satisfy that duty.

The only medical evidence that the plaintiff can point to is the uncorroborated statement that such "evidence exists" that Mr. Reive found in an interoffice memo in Transit's file, (JE 50 at PO1183), and Ms. Hare's self-serving and conclusionary affidavit. Considering the stakes involved, this hardly suffices as a businesslike investigation, particularly in light of the totally unexplained lack of an adequate response by Pfizer to Mr. Reive's request for medical documentation.

Putting aside for the moment Mr. Reive's initial ignorance

64

of the <u>Dairyland</u> decision and his later lack of regard for it, it was not reasonable for Mr. Reive to assume that just as a plaintiff exposed to silicone and asbestosis experiences a disease triggering date of implant, so a recipient of a defective mechanical valve experiences, a disease making the anxiety claims arguably within the policies. That might hold some water if Mr. Reive was in possession of medical evidence that demonstrated that working mechanical heart valves merit the same classification as documented generators of progressive disease like silicone and asbestos. But he didn't. The whole purpose of Dr. Gilchrest's testimony was to fill Mr. Reive's lack of medical evidence to support his decision. The defendant has demonstrated that Mr. Reive's failure here was not just negligence but gross negligence.

The application of "follow the settlements" doctrine is subject to the requirement that the reinsured make a reasonable, businesslike investigation. <u>National American Ins. Co. v. Certain Underwriters at Lloyd's London</u>, 93 F.3d 529, 536 (9th Cir. 1996). What is a reasonable, businesslike investigation of course must depend on the facts of each case. The factual findings support the conclusion that Mr. Reive's investigation was anything but reasonable and businesslike. Mr. Reive's investigation of the Pfizer claim was superficial, relying as it did on Pfizer's position and opinions of Transit's counsel, which

65

were even at times inaccurate.  The defendant has demonstrated that Mr. Reive did not make the kind of reasonable and businesslike investigation that the circumstances required.

Moreover, it is not surprising that for a case of this legal and medical complexity industry standards required Integrity to first obtain expert medical advice as to when bodily injury actually occurred and to retain its own coverage counsel for an opinion as to the appropriate trigger of coverage.  The failure to do so under the circumstances of this case also breached Integrity's duty to General Accident to make a reasonable, businesslike determination as to whether the Shiley Heart valve claims should have been allowed.

The Court has carefully scrutinized the trial testimony and the evidence as well as the arguments of counsel and concludes that the defendant has met its burden by a preponderance of the credible evidence that it is not obligated to follow the fortunes or settlements of Integrity.

### SUMMARY OF LEGAL CONCLUSIONS

1.  The Pfizer claims were not reasonably within the coverage of the 1983 and 1984 occurrence based policies of Integrity.

2.  Since the anxiety claims should not have been allowed, the Integrity policies were not penetrated.

3.  General Accident did not as a matter of contract agree to reinsure Integrity for injuries that did not occur within

66

the time periods covered by the 1983 and 1984 policies.

4.   Integrity's allowance of the Pfizer claims under all the circumstances surrounding the Shiley heart valve was grossly negligent and amounted to bad faith.

5.   Integrity did not make a reasonable, businesslike investigation and determination as to whether the heart valve claims should have been allowed.

6.   Consequently General Accident is not obligated to Integrity under the follow the settlements provision of its Facultative Certificate.  Judgment will therefore be entered for defendant General Accident.


Dated: July 14, 2006


                              /s/ William G. Bassler
                              WILLIAM G. BASSLER, U.S.S.D.J.